THOMAS P. O'BRIEN
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
KATHERINE M. HIKIDA
Assistant United States Attorney
Cal. Bar No. 153268
        Room 7516, Federal Building
        300 North Los Angeles Street
        Los Angeles, California 90012
        Telephone:  (213) 894-2285
        Facsimile:  (213) 894-7819
        katherine.hikida@usdoj.gov

Attorneys for Federal Defendant
JASON SWANSON

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MOHAMMAD SALAMEH, | NO. CV 98-8493-SVW(MLGx) |
| Plaintiff, | <u>DEFENDANT'S TRIAL BRIEF</u> |
| v. | Trial: 1/8/08 at 9:00 a.m. |
| JASON SWANSON, | |
| Defendant. | Before the Honorable<br>Stephen V. Wilson |

1

# TABLE OF CONTENTS

2  DEFENDANT'S TRIAL BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4  II.    STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5  III.   ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

6          A.     Inmate Salameh Cannot Establish That Officer Swanson
                  Personally Violated Inmate Salameh's Eight Amendment
7                 Right . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

Anderson v. County of Kern,
45 F.3d 1310 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bell v. Wolfish,
441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,
403 U.S. 388 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 25

Brosseau v. Haugen,
125 S. Ct. 596 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Chuman v. Wright,
76 F.3d 292 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Clement v. Gomez,
298 F.3d 898 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Crawford-El v. Britton,
523 U.S. 574 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Drummond ex rel. Drummond v. City of Anaheim,
343 F.3d 1052 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Estate of Ford v. Ramirez-Palmer,
301 F.3d 1043 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Hope v. Pelzer,
536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Hoptowit v. Spellman,
753 F.2d 779, 784 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Hudson v. McMillan,
503 U.S. 1 (1992) *quoting* Whitley v. Albers, 475 U.S. 312 (1986) . . . . . . . . . . . 22, 23

Hutto v Finney,
437 U.S. 678 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Jeffers v. Gomez,
267 F.3d 895 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

Johnson v. County of Los Angeles,
340 F.3d 787 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

Jones v. Williams,
    297 F.3d 930 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

Malley v. Briggs,
    475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Marquez v. Gutierrez,
    322 F.3d 689 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

Saucier v. Katz,
    533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22, 23, 24

Whitley v. Albers,
    475 U.S. at 312 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

## FEDERAL STATUTES

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

18 U.S.C. 844(I) & 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

18 U.S.C. § 844(D) & 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

18 U.S.C. § 3334 & 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1, 2

18 U.S.C. § 111 & 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

18 U.S.C. § 924(c) & 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

18 U.S.C. § 1546(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

### DEFENDANT'S TRIAL BRIEF

## I.   INTRODUCTION

Plaintiff Mohammad Salameh ("Inmate Salameh") claims that defendant Jason Swanson ("Officer Swanson") in his individual capacity violated the Eighth Amendment's prohibition against cruel and unusual punishment during a transfer from the general population unit to the Special Housing Unit ("SHU") of the United States Penitentiary at Lompoc, California ("USP Lompoc"). In this case, the evidence will show that Officer Swanson is not personally liable to Inmate Salameh under Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), because Inmate Salameh cannot establish that Officer Swanson violated Inmate Salameh's Eighth Amendment right by using malicious or sadistic force against him.

## II.   STATEMENT OF FACTS

Inmate Salameh was convicted of the 1993 World Trade Center bombing and was sentenced originally to 240 years (later amended to 116 years and 11 months with 5 years supervision) for Conspiracy  to Damage Building by Explosive Device, Explosive Destruction of Property, Explosive Destruction of Government Property, Interstate Transport of Explosives, Destruction of Motor Vehicle, Assault on Federal Officer, Using or Carrying a Destructive Device During a Crime of Violence, and False Statement on Immigration and Naturalization Service Application for Temporary/Permanent Resident Alien Status, in violation of 18 U.S.C. § 371, 18 U.S.C. § 844(I) & 2, 18 U.S.C. § 844(D) & 2, 18 U.S.C. §§ 3334 & 2, 18 U.S.C. § 111 & 2, 18 U.S.C. § 924(c) & 2, 18 U.S.C. § 1546 (a), respectively.  See Ex. 32 attached to Decl. of Joseph Fitzmaurice ("Fitzmaurice Decl."); Ex. 33 attached to Decl. of Jamie Bengford ("Bengford Decl.");  Swanson Decl., ¶ 2; Bengford Decl., ¶ 5; Decl. of Todd Manspeaker ("Manspeaker Decl."), ¶ 3; Decl. of Raymond Velasquez ("Velasquez Decl."), ¶ 4; Franco Decl., ¶ 3.

Inmate Salameh was incarcerated at the USP Lompoc from February 4, 1998 to September 26, 2002. See Ex. 21 attached to Decl. of Salvador R. Franco ("Franco Decl.") .  He was transferred to the Administrative Maximum Facility ("ADX") in Florence, Colorado on September 26, 2002, where he is presently incarcerated.  See Decl. of Jason Swanson ("Swanson Decl."), ¶ 2; Decl. of Robert Garcia ("Garcia Decl."), ¶ 3.

In 1998, the inmate population at USP Lompoc consisted on average of 1,035 to 1,100 inmates.   Decl. of Edwin Navato ("Navato Decl."), ¶ 2; Garcia Decl., ¶ 2. Inmate Salameh was not the only inmate at USP Lompoc convicted of terrorist activity, murder, bombing, anti-government stance, and other serious violence. Swanson Decl., ¶ 3.  Other inmates had similar serious convictions.  Id.  In fact, in 1998, the population of inmates at USP Lompoc included the most serious, violent, and heinous offenders in the Western Region including bank robbers, gang leaders, drug dealers, multiple murderers, murderers of law enforcement officers, child rapists, and terrorists.  See Decl. of Bernie Janusz ("Janusz Decl."), ¶ 2; Fitzmaurice Decl., ¶ 2; Bengford Decl., ¶ 2; Navato Decl., ¶ 2; Swanson Decl., ¶ 3; Garcia Decl., ¶ 2 .  These inmates required high and/or maximum security because of their lengthy sentences and risks for escape.  Fitzmaurice Decl., ¶ 2; Navato Decl., ¶ 2; Bengford Decl., ¶ 2.  It was not uncommon for USP Lompoc staff to respond to threats, assaults, riots, and other disturbance on a regular basis.  See Janusz Decl., ¶ 2; Fitzmaurice Decl., ¶ 3; Bengford Decl., ¶ 3.

In 1998, the tension at USP Lompoc was high because of racial problems between black and white inmates.  Fitzmaurice Decl., ¶ 3; Bengford Decl., ¶ 3. Between June 15, 1998 to June 17, 1998, the Special Investigative Services ("SIS") office at USP Lompoc received information that both black and white inmates were stockpiling weapons due to racial tensions and that there was going to be a violent conflict between members of the Sunni Muslim Community and the Odinist Community.  Garcia Decl., ¶ 4.  During this time, Lieutenant Fitzmaurice received

2

information from confidential informants and observations by recreation and chaplancy staff and housing unit officers that the tension was at a boiling point between black and white inmates.  Fitzmaurice Decl., ¶ 4; Bengford Decl., ¶ 4.

In the morning of June 17, 1998, Lieutenant Fitzmaurice briefed the Warden and Executive Staff on the intelligence that was gathered on the racial problem. Fitzmaurice Decl., ¶ 4; Manspeaker Decl., ¶ 2.  The Warden at USP Lompoc made the decision that morning to lockdown the institution.   Fitzmaurice Decl., ¶ 4; Bengford Decl., ¶ 4; Manspeaker Decl., ¶ 2.  A decision was made to place inmates in the SHU who were leadership figures of the various inmate groups involved including the Aryan Brotherhood, Odonists, Sunni Muslims, and African American inmates from Washington, D.C.  Id.  Lieutenant Fitzmaurice generated the two lists of inmates (white and black inmates) to be placed in SHU.   Fitzmaurice Decl., ¶ 4.

At the time, there were many reasons why Inmate Salameh was placed on one of these lists. Fitzmaurice Decl., ¶ 5.  Inmate Salameh was a prominent member of the Sunni Muslims.  Id.  He has a Jihaddist philosophy, which means that he harms or kills others to further his religious belief even if it means he would lose his own life. Fitzmaurice Decl., ¶ 5.  Inmate Salameh also had recently sent out a Last Will Statement/Islamic Funeral and Burial Arrangements Declaration on June 9, 1998. Id.; Ex. 19 attached to Fitzmaurice Decl.  Inmate Richard Scutari, the leader of the Odonists group at USP Lompoc also sent a Last Will and Testament that same week, which caused concern because it was unusual for both of them to do so. Fitzmaurice Decl., ¶ 5.   Inmate Salameh was also seen associating with Inmate Anthony Austin, a D.C. inmate, who was later known for attempting to organize Sunni Muslims to attack the members of the Aryan Brotherhood.  Id.  Furthermore, it was reasonable to believe that prison White supremacist gangs would have targeted Inmate Salameh and his cohorts.  Bengford Decl., ¶ 5.  Because there was a perceived threat to Muslim inmates, it was not unusual for Inmate Salameh to have been detained in SHU until the threat was investigated.  Id.   Based on the

information gathered regarding racial tensions at USP Lompoc and a possible

violent conflict, 19 inmates were identified as potential participants.

Garcia Decl., ¶ 4.   Inmate Salameh, a high-profile inmate and a known member of

the Sunni Muslim Community, was one of the inmates who was identified as a

potential participant.  Id.

The 19 inmates including Inmate Salameh were transferred to SHU on June

17, 1998.  Id.; Fitzmaurice Decl., ¶ 6.  Lieutenant Garcia supervised approximately 5

to 10 transfers of inmates to SHU at USP Lompoc on June 17, 1998.  Garcia Decl., ¶

4. Lieutenant Garcia supervised the two-member escort team that was assigned to

transfer Inmate Salameh from the M Unit, which was in the general population, to

SHU.  Id., ¶ 5.  The escort team consisted of two Special Operations Resource Team

("SORT") members, which are staff who volunteer for this duty and are highly

trained in tactical scenarios and disturbance control.  Id.; Janusz Decl., ¶ 4.  SORT

members qualify for the team by excelling at a physical fitness test, obstacle course,

use of firearms, and other requirements.  Janusz Decl., ¶ 4.  Further, SORT members

must be skilled at problem-solving , controlling highly stressful situations, and at all

times maintaining the honor and integrity of the BOP.  Id.

Inmate Salameh was placed in handcuffs while being transferred in

accordance with Bureau of Prisons ("BOP")  policy, which authorized BOP staff to

apply physical restraints in situations requiring precautionary restraints, particularly

in the movement or transfer of inmates (e.g., the use of handcuffs while moving

inmates to and from a cell in detention, escorting an inmate to SHU pending

investigation, etc.).   Garcia Decl., ¶ 6; Ex. 40 attached thereto; Janusz Decl., ¶ 5;

Ex. 40 attached thereto.  Inmate Salameh as well as the other 18 inmates were

placed in administrative detention in SHU pending an investigation of the potential

racial conflict.  Garcia Decl., ¶ 6; Bengford Decl., ¶ 7; Ex. 12 attached thereto.

Inmate Salameh was in handcuffs for the brief amount of time that it took the escort

team to transfer him from the general population housing unit to his cell in SHU.

Garcia Decl., ¶ 6.

Case Manager Janusz and Officer Swanson were the two-member escort team that was assigned to transfer Inmate Salameh from the M Housing Unit to SHU on June 17, 1998. Janusz Decl., ¶¶ 4, 5; Swanson Decl., ¶ 5. During Inmate Salameh's escort on June 17, 1998, both Case Manager Janusz and Officer Swanson wore their SORT uniforms which included helmets, gas masks, batons, black jump suits, and other gear. Janusz Decl., ¶ 4; Swanson Decl., ¶ 5. Both Case Manager Janusz and Officer Swanson would have had their helmets and full gear on except for the gas masks which were not used because no tear gas was deployed. Id.

Officer Swanson does not recall any particular interaction with Inmate Salameh prior to June 17, 1998, although he recalls seeing Inmate Salameh in the company of other Muslim inmates. Swanson Decl., ¶ 4. Officer Swanson recalls seeing Inmate Salameh in the company of other Muslim inmates. Id. Inmate Salameh's co-defendants in the 1993 World Trade Center bombing were also housed at USP Lompoc in 1998, which among others included Fadil Abdelgani and Mahmud Abouhalima. Swanson Decl., ¶ 4. Officer Swanson specifically recalls speaking with Inmate Abdelgani and Inmate Abouhalima in USP Lompoc's Medical Department's second floor law library cell. Swanson Decl., ¶ 4. The conversation was memorable because Inmate Abdelgani became argumentative with Officer Swanson when Inmate Abdelgani was in the law library, which is a cell that is secured when an inmate is using it. Id. Inmate Abdelgani asked if Inmate Abouhalima could join him in the law library cell to assist Inmate Abouhalima with his legal issue. Swanson Decl., ¶ 4. Officer Swanson informed Inmate Abdelgani that it was inappropriate for Inmate Abouhalima to be in the law library cell with him. Id.

Officer Swanson participated in escorting up to 20 inmates from the general population to SHU on June 17, 1998. Swanson Decl., ¶ 5. He did not have to use any force to move any inmates to SHU on that date. Id. He was later

informed that Inmate Salameh was one of the inmates who was escorted that day but does not specifically recall escorting Inmate Salameh, distinct from the other inmates.  Swanson Decl., ¶ 5.  Officer Swanson recalls that the inmates from the M Unit walked to SHU, which includes the H and I Housing Units, under their own power and were not physically lifted or carried by members of the escort team and the inmates were not abused in any manner en route to SHU or at any time during the escorts/transfers on June 17, 1998.  Id.

Inmate Salameh was escorted from the M Housing Unit to the I Housing Unit in SHU.  Garcia Decl., ¶ 7; Janusz Decl., ¶ 5.  The escort began when Lieutenant Garcia arrived in the M Housing Unit.  Garcia Decl., ¶ 7.  Inmate Salameh was on the second floor in his cell number C-5.  Id.  He was advised to submit to handcuffs, to which he complied.  Garcia Decl., ¶ 7; Janusz Decl., ¶ 5.  Although Officer Swanson does not specifically recall placing handcuffs on Inmate Salameh, Officer Swanson would have known if Inmate Salameh's handcuffs were applied too tightly because his standard practice in applying handcuffs is to take a finger and place it near the inside of the ring before and as Officer Swanson tightened each handcuff.  Swanson Decl., ¶ 6.  This ensured that there was enough space between the wrist and the handcuff.  Swanson Decl., ¶ 6.  Officer Swanson repeats the same procedure on the other wrist.  Id.  If the handcuffs were applied too tightly, Officer Swanson would unkey the handcuffs and loosen them without applying any additional pressure on Inmate Salameh's wrists or hands.  Swanson Decl., ¶ 6.

Officer Swanson does not recall any inmates complaining about their handcuffs being too tight on June 17, 1998.  Id.  Case Manager Janusz also does not recall Inmate Salameh complaining that his hand restraints were too tight.  Janusz Decl., ¶ 7.  Lieutenant Garcia does not recall Inmate Salameh complaining about any injury to his hands or wrists due to the handcuffs.  Garcia Decl., ¶ 11.  If an

inmate had complained about his handcuffs being too tight, Officer Swanson would

have checked the handcuffs and unkeyed them if necessary to loosen them as described above. Swanson Decl., ¶ 6. However, because it is Officer Swanson's standard practice to place a finger near the inside of the ring before and as he tightens each handcuff, inmates do not complain that the handcuffs Officer Swanson places on them are too tight. Id.

Once Inmate Salameh was handcuffed, he was asked to step back and the door of his cell number C-5 was opened. Garcia Decl., ¶ 7. The two-member SORT team walked with Inmate Salameh down the hall of the second floor and down one flight of stairs. Garcia Decl., ¶ 7; Janusz Decl., ¶ 5; When practical, Inmate Salameh was in the middle and each SORT team member were on either side of Inmate Salameh. Garcia Decl., ¶ 7. At all times during the escort, Inmate Salameh walked without assistance. Id.; Janusz Decl., ¶ 6; Swanson Decl., ¶ 5. The two SORT members who escorted Inmate Salameh never carried him or lifted him up under his arms so his feet were not touching the ground or so Inmate Salameh had to tiptoe. Garcia Decl., ¶ 7; Swanson Decl., ¶ 5; Janusz Decl., ¶ 6. Lieutenant Garcia was walking with them during the entire transfer from the M Housing Unit to the I Housing Unit. Garcia Decl., ¶ 7. Lieutenant Garcia guided the escort out of the M Housing Unit. Id. There were no significant events during the passage from Inmate Salameh's cell in the M Housing Unit to the door of the M Housing Unit. Garcia Decl., ¶ 7. Lieutenant Garcia was watching and had a clear view of Inmate Salameh's escort at all times, and did not observe or hear any shoving, pushing, or slamming into gates, bars or walls; or stepping on Inmate Salameh's toes or feet; or any conduct which could be considered mistreatment or abusive. Id.

The SHU consisted of two separate housing units, H and I. Garcia Decl., ¶ 8; Fitzmaurice Decl., ¶ 7. The main door to the SHU is in the H Housing Unit. Id. After exiting the M Housing Unit, Officer Swanson, Case Manager Janusz, Inmate Salameh, and Lieutenant Garcia walked directly to the H Housing Unit. Id. The H

Housing Unit entrance in SHU is a few feet away from the M Housing Unit door
and directly across from each other.  Garcia Decl., ¶ 8.   Lieutenant Manspeaker
specifically remembers seeing some of the SORT members escorting Inmate
Salameh from the M Housing Unit when he happened to be walking the East
corridor as Inmate Salameh was coming out of the M Housing Unit.  Manspeaker
Decl., ¶ 4.  Lieutenant Manspeaker saw Lieutenant Garcia, the SORT leader, but
does not recall recognizing the SORT members because he believes they were
wearing helmets with the face shields down.  Id.  Lieutenant Manspeaker remembers
that Inmate Salameh called out to him when Inmate Salameh saw him in the corridor
and asked Lieutenant Manspeaker why Inmate Salameh was going to the SHU.  Id.
Lieutenant Manspeaker told Inmate Salameh something to the effect that there was a
lockdown and Inmate Salameh would be informed of the reason for his placement.
Manspeaker Decl., ¶ 4.

Lieutenant Manspeaker specifically recalls that Inmate Salameh walked
without assistance.  Manspeaker Decl., ¶ 5.  Inmate Salameh was not carried or
lifted up under his arms so his feet were not touching the ground or so Inmate
Salameh had to tiptoe.  Id.  Lieutenant Manspeaker does not recall Inmate Salameh
complaining about any injury to his hands or wrists due to the hand restraints or
injury to his face, feet, or any other part of his body and would certainly remember
if he had done so.   Manspeaker Decl., ¶ 5.  Lieutenant Manspeaker did not see any
cuts, bruises, or marks on Inmate Salameh's face or any blood on him.  Id.  If he had
seen any cuts, bruises, or marks on Inmate Salameh's face or any injury to his hands
or wrists, or any blood on him, Lieutenant Manspeaker would have informed
Lieutenant Garcia and called for medical staff to see Inmate Salameh at the SHU.
Manspeaker Decl., ¶ 5.

The door to the H Unit was opened and the two-member escort team with
Inmate Salameh and Lieutenant Garcia entered and then the door was locked behind

the four of them.  Garcia Decl., ¶ 8.  On June 17, 1998, Officer Velasquez was

working as the H Housing Unit Number 2 Officer with a schedule of 8:00 a.m. to 4:00 p.m., which on the roster appeared as "SHU #2." See Ex. 35 attached to Velasquez Decl.; Velasquez Decl., ¶ 3.   As the H Housing Unit Number 2 Officer, Officer Velasquez would have opened the H Housing Unit door for the SORT members and inmates to enter on June 17, 1998. Velasquez Decl., ¶ 3.   Officer Velasquez does not recall seeing Inmate Salameh submit to the visual strip search but he describes the standard procedure used by staff. Id.,¶ 5.  Inmate Salameh's hand restraints would have been removed while the visual strip search was conducted. Id.  After Inmate Salameh submitted to the visual search, then he would have changed out of his general population clothes, including shoes, and into the authorized SHU clothes.  Velasquez Decl., ¶ 5.  Once the visual search was completed and his clothes were exchanged, he would have been placed in hand restraints again and then the H Housing Unit Strip Cell door on the other side would have been opened. Id.  The visual strip search, clothes exchange and walk through the H Housing Unit to the I Housing Unit would have been approximately 10 to 15 minutes, or sometimes faster.  Velasquez Decl., ¶ 5.

Officer Velasquez does not recall Inmate Salameh complaining about any injury to his hands or wrists due to the hand restraints or injury to his face, feet, or any other part of his body.  Velasquez Decl., ¶ 6.  Officer Velasquez did not see any cuts, bruises, or marks on Inmate Salameh's face or any blood on him. Id.  He did not see any indentations, grooves, or broken skin on Inmate Salameh's hands or wrists.  Velasquez Decl., ¶ 6.  If Officer Velasquez had seen any cuts, bruises, or marks on his face, or any injury to his hands or wrists, or any blood on him, Officer Velasquez would have informed Lieutenant Garcia, other Lieutenants and called for medical staff. Id.  However, Officer Velasquez did not see or hear Inmate Salameh or any other inmate getting assaulted by staff or inmates while he was in the H Housing Unit that day.  Velasquez Decl., ¶ 6.  Officer Velasquez would have heard

or seen the incident if the staff had to use force on Inmate Salameh or any other

inmates on June 17, 1998.  <u>Id</u>.  He did not hear or see Inmate Salameh complain of being assaulted or injured either before, during, or after the visual strip search and the subsequent walk through the H Housing Unit to the I Housing Unit.  Velasquez Decl., ¶ 6.  Officer Velasquez did not receive any report from staff or inmates that Inmate Salameh was assaulted during the escort.  <u>Id</u>.  He would have remembered if Inmate Salameh was assaulted in the SHU.  Velasquez Decl., ¶ 6.  Officer Velasquez would have been required to report such an incident to his supervisor and/or to write a memorandum concerning such an incident.  <u>Id</u>.  Officer Velasquez did not have any further contact with Inmate Salameh after he was moved to the I Housing Unit of the SHU.  Velasquez Decl., ¶ 6.

Lieutenant Garcia does not recall any significant event during the passage from the hallway corridor to the entrance of the H Housing Unit or as they entered the H Housing Unit; the door was locked behind them.  <u>Id</u>.  Lieutenant Garcia was watching the escort team's actions as well as Inmate Salameh and did not observe or hear any abusive conduct towards Inmate Salameh, including any shoving, pushing, or slamming into gates, bars or walls; or stepping on Inmate Salameh's toes or feet.  <u>Id</u>.  The two-member escort team placed Inmate Salameh in a strip-search cell, which was located on the left side of the main door to the H Housing Unit.  Garcia Decl., ¶ 8; Fitzmaurice Decl., ¶ 8.  Inmate Salameh remained in the holding cell by himself for a visual strip search. Fitzmaurice Decl., ¶ 8.  Inmate Salameh was given a visual search and then given new clothes appropriate for inmates held in SHU.  Garcia Decl., ¶ 8.  Lieutenant Garcia recalls that Inmate Salameh complied with this procedure without incident.  <u>Id</u>.  He recalls that at some point during this time Inmate Salameh asked Lieutenant Garcia why he was being taken to SHU and he recalls telling Inmate Salameh that he would be informed by the appropriate staff shortly.  Garcia Decl., ¶ 8.

After the visual search, Inmate Salameh was escorted to his final destination which was in the I Housing Unit, that is the second housing unit in SHU.  Garcia

Decl., ¶ 9.  During the walk to the I Housing Unit, Lieutenant Garcia does not recall Inmate Salameh resisting or causing the escort team to use any force.  Id.  He complied with the escort team and there were no significant events during this walk from the H Unit to the I Housing Unit.  Garcia Decl., ¶ 9.  Lieutenant Garcia was watching during the entire escort and did not observe or hear any mistreatment or abusive conduct towards Inmate Salameh.  Id.

The route that Inmate Salameh took would have been as seen in the videotape of the reenactment.  See Ex. 10 attached to Fitzmaurice Decl.; Fitzmaurice Decl., ¶ 10.  There was no actual videotape of Inmate Salameh's escort on June 17, 1998 because there was no use of force or other significant event that would have prompted the use of the video camera.  Fitzmaurice Decl., ¶ 10.

On or about 3:25 p.m. on June 17, 1998, Officer Edwin Navato noted in the I Housing Unit logbook that he received Inmate Salameh in the I Housing Unit.  See Ex. 36 attached to Navato Decl.; Navato Decl., ¶ 4.  Officer Navato recalls that the SORT team brought in inmates to the SHU from the general population.  Id.  He relieved other staff in the I Housing Unit and then he assumed the duties as the Officer-in-Charge of the I Housing Unit.  Navato Decl., ¶ 4.  Officer Navato recalls checking the incoming inmates, including their name and background information, their appearance, and other information for processing them.  Id.  He also assigned the cells and cell-mates for the inmates who were brought into the I Unit.  Navato Decl., ¶ 4.  Officer Navato specifically recalls Inmate Salameh coming into the I Housing Unit.  Id.  Inmate Salameh was barefoot and appeared furious that Muslims were taken to SHU because he did not know the reason for the lock-up.  Navato Decl., ¶ 4.  Inmate Salameh was asking for his personal shoes and property.  Id.  Personal shoes are not allowed in SHU because this property would have to be stored until Inmate Salameh returned to the general population.  Navato Decl., ¶ 4.  Officer Navato does not recall specifically, however, Inmate Salameh may have

refused to wear the shoes that were given to inmates in SHU.  Id.

As part of his duties, Officer Navato assessed Inmate Salameh's appearance at the time he came in to the I Housing Unit.  Navato Decl., ¶ 5.  Officer Navato did not see any injuries to Inmate Salameh's face or any other part of his body.  Id. Officer Navato did not observe any cuts, scratches, bruises, or other injuries on Inmate Salameh nor did he see any blood on Inmate Salameh.  Navato Decl., ¶ 5.  If Officer Navato had observed any of the foregoing, he would have reported it according to BOP procedure and medical assistance would have been summoned. Id.  However, because there were no injuries to report, Officer Navato did not report anything with respect to Inmate Salameh either during or after the escort on June 17, 1998.  Navato Decl., ¶ 5.  Officer Navato will testify that Inmate Salameh walked on his accord while in the I Housing Unit.  Id.  Officer Navato does not recall seeing or hearing that Inmate Salameh's toes were stepped on at any time.  Navato Decl., ¶ 5. Inmate Salameh did not complain to Officer Navato of any injuries.  Id.  Officer Navato does not recall calling for medical assistance for Inmate Salameh.  Navato Decl., ¶ 5.

Officer Navato will testify that Inmate Salameh did not report that the SORT team assaulted him during the escort from the general population.  Navato Decl., ¶ 6.  Moreover, Officer Navato will also testify that he did not witness any of the members of the SORT team push, bang, or pull Inmate Salameh into the walls, bars, or gates or step on Inmate Salameh's toes, either intentionally or otherwise.  Id. Officer Navato does not recall Inmate Salameh complaining to him about being treated in a forceful or abusive manner.  Navato Decl., ¶ 6.  Officer Navato did not observe any unusual event or activity such as assault or disturbance with respect to the transport of Muslim inmates to the I Housing Unit on June 17, 1998.  Id., ¶ 7. Officer Navato did not note any such incident in the logbook.  Id.  While Inmate Salameh was in the I Housing Unit, he did not report any assault or injuries to Officer Navato.  Navato Decl., ¶ 7.  Officer Navato will testify that the SORT team acted professionally at all times in the I Housing Unit.  Id., ¶ 6.

When they arrived in the I Housing Unit, Lieutenant Garcia recalls instructing the two-member escort team to place Inmate Salameh in a cell.  Garcia Decl., ¶ 10.  On June 17, 1998, upon his arrival in the I Unit of SHU, Inmate Salameh was placed in cell C-15 with another Muslim inmate, Fadil Abdelgani, who was also convicted for his actions in the first World Trade Center bombing.  See Ex. 32 attached to Fitzmaurice Decl.; Swanson Decl., ¶ 4.  Pursuant to BOP policy, inmates are not released from their restraints before being secured behind the cell doors.  Id.  As soon as Inmate Salameh had been secured in the cell, Lieutenant Garcia recalls asking him to place his hands through the food slot so that Lieutenant Garcia could remove his handcuffs in accordance with BOP policy.  Garcia Decl., ¶ 10.  Lieutenant Garcia removed Inmate Salameh's handcuffs by placing his hand on Inmate Salameh's arm while Lieutenant Garcia unkeyed the handcuffs, and then holding onto the handcuffs while each ring was opened.  Id.  He did not touch Inmate Salameh other than to remove his handcuffs.  Garcia Decl., ¶ 10.

Lieutenant Garcia does not recall Inmate Salameh complaining about any injury to his hands or wrists due to the handcuffs or injury to his face, feet, or any other part of his body.  Garcia Decl., ¶ 11.  Specifically, Lieutenant Garcia was face-to-face with Inmate Salameh when he removed his handcuffs.  Id.  Lieutenant Garcia did not see any cuts, bruises, or marks on Inmate Salameh's face or any blood on him.  Id.  Lieutenant Garcia was able to see Inmate Salameh's hands and wrists when he removed his handcuffs.  Garcia Decl., ¶ 11.  Lieutenant Garcia did not see any indentations, grooves, or broken skin on Inmate Salameh's hands or wrists.  Id.  If Lieutenant Garcia had seen any cuts, bruises, or marks on Inmate Salameh's face, or any injury to his hands or wrists, or any blood on him, Lieutenant Garcia would have immediately ordered the escorting staff to call for medical assistance.  Garcia Decl., ¶ 11.  Lieutenant Garcia would also have reported the injuries to the Captain and would have instructed staff to prepare memorandums, which was standard procedure.  Id.  Lieutenant Garcia did not prepare any memorandum or other document reporting on the escort which occurred

on June 17, 1998.  Garcia Decl., ¶ 11.  He did not take any of these steps because he did not observe Inmate Salameh suffer any injuries or see any injuries on him.  Id. Inmate Salameh did not complain of any injuries to Lieutenant Garcia during or after the escort on June 17, 1998.  Garcia Decl., ¶ 11.  The escort went according to plan without any injury to staff or Inmate Salameh.  Id.

While the supervisor of the escort team, Lieutenant Garcia did not observe any actions by his subordinates which were not appropriate or not within the established policies.  Garcia Decl., ¶ 12.  At no time did he observe Inmate Salameh being assaulted by the escort team or having excessive force used against him.  Id. Lieutenant Garcia did not and would not have acquiesced in such conduct and would have reported it if he had observed such conduct.  Garcia Decl., ¶ 12.

At all times during the escort, Officer Swanson was in Case Manager Janusz's sight and immediate area.  Janusz Decl., ¶ 6.  Case Manager Janusz's testimony is that no one used force to subdue or control Inmate Salameh when he entered the H Housing Unit with Officer Swanson and Lieutenant Garcia.  Id.  If anyone had done so, Case Manager Janusz would have notified Lieutenant Garcia who was present during the escort of Inmate Salameh and also would have prepared a memorandum reporting on any use of force.  Janusz Decl., ¶ 6.  Officer Swanson and Case Manager Janusz did not and would not have shoved, pushed, or slammed Inmate Salameh into gates, bars or walls; or stepped on Inmate Salameh's toes or feet.  Id.  Case Manager Janusz did not see or hear anyone commit any conduct which could be considered mistreatment or abuse of Inmate Salameh.  Janusz Decl., ¶ 6.  Case Manager Janusz does not recall Inmate Salameh complaining about any injury to his hands or wrists due to the hand restraints or injury to his face, feet, or any other part of his body.  Janusz Decl., ¶ 10.  Had Inmate Salameh complained about any injury, Janusz would have informed Lieutenant Garcia and called for medical assistance.  Id.  Case Manager Janusz did not see any cuts, bruises, or marks on Inmate Salameh's face or any blood on him.  Id.  He also did not see any

indentations, grooves, or broken skin on Inmate Salameh's hands or wrists. Janusz Decl., ¶ 10. If he had seen any cuts, bruises, or marks on Inmate Salameh's face or any injury to his hands or wrists, or any blood on him, Case Manager Janusz would have informed Lieutenant Garcia and called for medical staff. Id. He would also have prepared a memorandum. Janusz Decl., ¶ 10. However, Case Manager Janusz did not take any of these steps because he did not observe Inmate Salameh suffer any injuries or see any injuries on him. Id. As a Case Manager, Janusz made weekly SHU rounds, which was in addition to going to SHU to assist inmates in his caseload. Id., ¶ 11. While Case Manager Janusz was in SHU, he does not recall Inmate Salameh telling him or others that he was assaulted by the SORT members on June 17, 1998. Id. If he had done so, Janusz would have reported it and written a memorandum accordingly. Id.

Inmate Salameh alleges that Officer Swanson pushed him into the bars of gates in SHU and that he stepped on his toes. Swanson Decl., ¶ 7. Officer Swanson will testify that he did not have any inmates resist or fight him and the other escort team member. Id. Officer Swanson did not push or pull any inmate into the walls, bars, gates or other areas on June 17, 1998. Swanson Decl., ¶ 7. If he had to use force necessary to control Inmate Salameh, he would have remembered doing so. Id. If force needed to be used, the use of force procedure would have to be followed including videotaping the incident, calling additional staff to assist, using less than lethal weapons, and other security measures. Swanson Decl., ¶ 7. Additionally, each escort member would have to report the incident in writing. Id. Officer Swanson did not prepare any report with respect to Inmate Salameh's transfer on June 17, 1998, because there was no need to file a report as the transfer was uneventful and no incidents occurred. Id.

Officer Swanson did not observe any cuts, scratches, bruises, or other injuries on Inmate Salameh nor did he see any blood on Inmate Salameh. Swanson Decl., ¶ 8. If he had observed any of the foregoing, he would have reported it according to BOP procedure and medical assistance would have been summoned. Id. However,

because there were no injuries to report, Officer Swanson did not report anything with respect to Inmate Salameh either during or after the escort on June 17, 1998. Id.  Furthermore, the inmates that Officer Swanson escorted walked on their own accord to the H or I Housing Units of SHU.  Swanson Decl., ¶ 8.  Officer Swanson does not recall stepping on Inmate Salameh's toes at any time.  Id.  It is his normal practice to maintain a reasonable distance between the inmates and himself without compromising security.  Id.  During the entire time the inmates were escorted on June 17, 1998, Officer Swanson did not have to use any force.  Swanson Decl., ¶ 8. Further, he did not step on any inmate's toes.  Id.  If he had stepped on Inmate Salameh's toes, he would have remembered and documented it.  Id.  In all, Inmate Salameh's transfer from the M Housing Unit to SHU was uneventful and unmemorable to Officer Swanson.  Swanson Decl., ¶ 8.  Officer Swanson does not recall any incidents occurring on June 17, 1998, which bear any resemblance to the actions Inmate Salameh has alleged and would certainly have remembered such events had they occurred.  Id.

Moreover, Officer Swanson also did not witness any of the other members of the escort team push, bang, or pull Inmate Salameh into the walls, bars, or gates, or step on Inmate Salameh's toes, either intentionally or otherwise.  Swanson Decl., ¶ 9.  He does not recall Inmate Salameh complaining to him about being treated in a forceful or abusive manner.  Id.  He also do not recall Inmate Salameh complaining to anyone on June 17, 1998, about being treated in a forceful or abusive manner. Id.

Special Investigative Specialist Officer Jamie Bengford provided Inmate Salameh a copy of the Administrative Detention Order on June 17, 1998, at the I Housing Unit in SHU, after he signed the Order.  Bengford Decl., ¶ 7; Ex. 12 attached thereto.  When Officer Bengford handed Inmate Salameh the Administrative Detention Order, Bengford recalls that Inmate Salameh did not mention any staff assault or injuries to him.  Bengford Decl., ¶ 8.  Officer Bengford

did not see any injuries to Inmate Salameh's face or any part of his body.  Id.
Inmate Salameh did not ask Officer Bengford for medical assistance.  Id.  Because
of  Bengford's work as an SIS Officer, he would have a higher duty to observe and
report any staff misconduct issues.  Bengford Decl., ¶ 8.  Officer Bengford would
have contacted his supervisor immediately and prepared a memorandum if Inmate
Salameh had reported to him that he had been assaulted or injured or if Officer
Bengford had suspected that Inmate Salameh had been assaulted or injured by any
BOP staff on June 17, 1998.  Id.  Moreover, Officer Bengford routinely made
rounds in SHU at least twice a week and made rounds in SHU while Inmate
Salameh was in SHU.  Id.  If there was an incident in SHU, Officer Bengford also
responded and investigated with other SIS staff, which meant he could be in SHU
for a few hours at a time.  Bengford Decl., ¶ 8.   While Inmate Salameh was in SHU
from June 17, 1998 to June 30, 1998, he did not report to Officer Bengford that he
was assaulted by anyone while he was being escorted from the M Unit to the I Unit
of SHU.  Id.

Lieutenant Garcia was assigned to work in SHU during the time that Inmate
Salameh was in the I Housing Unit of SHU.  Garcia Decl., ¶ 13.   On June 24, 1998,
Lieutenant Garcia also conducted Inmate Salameh's 7-day special housing review.
Id.; Ex. 23 attached thereto.  During the special housing review, Lieutenant Garcia
personally interviewed Inmate Salameh.  Garcia Decl., ¶ 13.  However, Inmate
Salameh did not report any staff misconduct to him during the interview or at any
time during the period Lieutenant Garcia was assigned to work in SHU while Inmate
Salameh was also in SHU.  Id.  Lieutenant Garcia would be required to inform his
supervisors accordingly, if Inmate Salameh had reported any staff

misconduct and would have done so.  Id.

Correctional Counselor Salvador Franco talked to and observed Inmate
Salameh on a daily basis at the M Housing Unit.  Franco Decl., ¶ 3.  He worked on
Inmate Salameh's programming needs and worked well with him.  Id., ¶ 4.  On his

weekly rounds in SHU, Counselor Franco would talk to or see Inmate Salameh.  <u>Id</u>., ¶ 3.   At any time, Inmate Salameh could ask for Counselor Franco to talk or see him in the I Housing Unit.  <u>Id</u>.  Counselor Franco recalls resolving many of Inmate Salameh's minor grievances informally before he filed any administrative remedy. Franco Decl., ¶ 4.  Inmate Salameh was constantly complaining about various minor issues that were not to his satisfaction.  <u>Id</u>.   However, Counselor Franco does not recall Inmate Salameh ever reporting or complaining to him about the alleged mistreatment on June 17, 1998 or any BOP staff assaulting or causing him injury at that time.  <u>Id</u>.  If Inmate Salameh had reported an assault, even if the injuries were as minor as they allegedly were in this incident, Counselor Franco would have reported it to his supervisor and written a memorandum as required regarding any mistreatment of an inmate.  Franco Decl., ¶ 5.  The incident and staff involved would have been investigated accordingly.  <u>Id</u>.  However, Counselor Franco never reported any such assault by BOP staff or wrote any memorandums about Inmate Salameh being assaulted or abused because Inmate Salameh did not report or complain to Counselor Franco that he was ever assaulted or abused by BOP staff. <u>Id</u>.  Counselor Franco never observed any cuts or bruises on Inmate Salameh's face or any part of his body.  Franco Decl., ¶ 5.

    Lieutenant Manspeaker does not recall receiving any report from any inmate or staff that Inmate Salameh was assaulted by staff while in the SHU on June 17, 1998.  Manspeaker Decl., ¶ 6.  He would have heard or seen the incident if the staff had to use force on Inmate Salameh or any other inmates on June 17, 1998.  <u>Id</u>.  He would have remembered if Inmate Salameh was assaulted on that date.  <u>Id</u>.  At that time, Lieutenant Manspeaker made weekly SHU rounds, which was in addition to going to SHU to talk to staff or inmates a few times during the week. Manspeaker Decl., ¶ 7.  While he was in SHU, Inmate Salameh did not tell Lieutenant Manspeaker or others that he was assaulted by the SORT members on June 17, 1998.  <u>Id</u>.  Lieutenant Manspeaker recalls having other discussions with Inmate Salameh after his release from the SHU but the alleged June 17 incident was not

discussed with Manspeaker.  Id.

On June 29, 1998, Lieutenant Fitzmaurice interviewed the 19 inmates who were placed in SHU on June 17, including Inmate Salameh.  Fitzmaurice Decl., ¶ 11.  During the interview, Inmate Salameh did not mention any staff assault or injuries.  Id., ¶ 12.  Lieutenant Fitzmaurice did not see any injuries to Inmate Salameh's face or any part of his body.  Id.  No inmate witnessed the alleged assault of Inmate Salameh, while he was being escorted through the H Unit to the I Unit.  Fitzmaurice Decl., ¶ 13.

The evidence will further show that even when Inmate Salameh complained of injuries later in the day on June 17, 1998, to Physician's Assistant Pagaduan, he did not exhibit any injuries which appeared to result from excessive force.  See Decl. of Grethel Pagaduan ("Pagaduan Decl."), ¶¶ 3, 4 and 5; Ex. 4 attached thereto. Inmate Salameh complained of soreness and numbness to the wrists, a common occurrence after the utilization of secure handcuffs.  Pagaduan Decl., ¶ 3.   The handcuff marks on his wrists consisted of a little redness but no indentation, grooves, or broken skin on the wrists.  Id., ¶ 5.  She did not observe any redness or swelling with respect to Inmate Salameh's eyes or eyelids.  Id., ¶ 9.  Inmate Salameh never mentioned to the Physician's Assistant on June 17, 1998, that he had any problems with his eyes.  Id. Inmate Salameh had a small amount of blood on one of his toenails that had originated from the small 0.5 cm cut on his chin and had dripped down to his toenail.  Pagaduan Decl., ¶¶ 4, 5.  Inmate Salameh did not have any other cuts or blood on him.  Id., ¶ 10.  His toes did not appear to have been stomped on; they were not red, bruised, swollen, cut, or injured in any way.  Id.

The Physician's Assistant noted that Inmate Salameh only had a minor scratch on the right side of his face.  Pagaduan Decl., ¶ 4.  The small cut and minor scratch on Inmate Salameh's face were not consistent with being forcibly banged into bars, gates or walls but could have been self-inflicted or caused by any number of other minor accidents or conflicts.  Id., ¶ 10.  Even if the blood had come from his toe,

such minor bleeding on a toenail was more consistent with stubbing his toe than with having his bare feet stomped on by booted guards during the transfer.  Id.

A week later, on June 24, 1998, he was seen by Physician's Assistant Mahesh Patel, who will testify that Inmate Salameh was complaining of "blue eye" with respect to his right eye.  Decl. of Mahesh Patel ("Patel Decl."), ¶ 5.  However, the Physician's Assistant will testify that he observed no echymosis (no black eye) and only a minor bruise to Inmate Salameh's right upper eyelid, which was not indicative of any significant trauma.  Id., ¶¶ 6-7.

Dr. Philip Ente, a neurologist, will testify that as a BOP-contracting physician he was consulted in April 2000, because Inmate Salameh was claiming numbness in his left hand and he examined Inmate Salameh at that time.   Decl. of Dr. Philip Ente ("Ente Decl."), ¶¶ 2-8.  Based on Dr. Ente's examination and testing, he found  that there was no damage to any of the nerves going through Inmate Salameh's left wrist. Id., ¶ 8.  Dr. Ente's diagnosis was that Inmate Salameh did not have any injury to his hand due to handcuffs.  Id., ¶ 9.

## III.   ARGUMENT

A.  Inmate Salameh Cannot Establish That Officer Swanson

Personally Violated Inmate Salameh's Eight Amendment Right.

Inmate Salameh's claims are brought against Officer Swanson under Bivens. In order to prevail in his Bivens claim against Officer Swanson, Inmate Salameh must establish that Officer Swanson personally violated his Eighth Amendment right.  See Chuman v. Wright, 76 F.3d 292, 294 (9th Cir. 1996); Jones v. Williams, 297 F.3d 930, 934-35 (9th Cir. 2002).   Specifically, in order to prevail in his Eighth Amendment claim, Inmate Salameh must establish that Officer Swanson used malicious or sadistic force against Inmate Salameh.  Jeffers v. Gomez, 267 F.3d 895, 910-11 (9th Cir. 2001).

The conditions of a prisoner's incarceration are subject to analysis under the Eighth Amendment.  Hutto v Finney, 437 U.S. 678, 685 (1978); Hoptowit v.

1  <u>Spellman</u>, 753 F.2d 779, 784 (9th Cir. 1985).  However, under the Eighth
2  Amendment doctrine, prison officials are afforded "wide-ranging deference in the
3  adoption and execution of policies and practices that in their judgment are needed to
4  preserve internal order and discipline and to maintain institutional security."  <u>Bell v.</u>
5  <u>Wolfish</u>, 441 U.S. 520, 547 (1979); <u>Anderson v. County of Kern</u>, 45 F.3d 1310,
6  1316 (9th Cir. 1995), *as amended* 75 F.3d 448 (1995), *cert. denied,* 516 U.S. 916
7  (1995).

8       In particular, "[t]he unnecessary and wanton infliction of pain...constitutes
9  cruel and unusual punishment forbidden by the Eighth Amendment." <u>Hudson v.</u>
10 <u>McMillan</u>, 503 U.S. 1, 5 (1992) *quoting* <u>Whitley v. Albers</u>, 475 U.S. 312, 319
11 (1986). What is necessary to establish unnecessary and wanton infliction of pain
12 varies according to the nature of the constitutional violation. <u>Whitley</u>, 475 U.S. at
13 320. When prison officials are accused of using excessive physical force in violation
14 of the Eighth Amendment, the "core judicial inquiry is...whether force was applied
15 in a good-faith effort to maintain or restore discipline, or maliciously and
16 sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 7-8, *citing* <u>Whitley v. Albers</u>, 475
17 U.S. 312 (1986).  Accordingly, the plaintiff must establish that the defendant used
18 malicious or sadistic force against him.  <u>Jeffers v. Gomez</u>, 267 F.3d 895, 910-11 (9th
19 Cir. 2001).

20      However, the Eighth Amendment's prohibition on cruel and unusual
21 punishments "necessarily excludes from constitutional recognition de minimis uses
22 of physical force, provided that the use of force is not of a sort 'repugnant to the
23 conscience of mankind.'" <u>Hudson v. McMillian</u>, 503 U.S. 1 at 9-10, *citing* <u>Whitley</u>,
24 475 U.S. at 327.  Thus, the Supreme Court has recognized that not every
25 "malevolent touch by a prison guard gives rise to a federal cause of action." *Id.*

26      In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court clarified the test
27 for qualified immunity and established a two-step analysis.  *Id.*; <u>Drummond ex rel.</u>
28 <u>Drummond v. City of Anaheim</u>, 343 F.3d 1052, 1056 (9th Cir. 2003).  The first step
   is to determine whether the alleged actions are unconstitutional as a matter of law.

1  |  *Saucier*, 533 U.S. at 201; *see also* <u>Johnson v. County of Los Angeles</u>, 340 F.3d 787,

2  |  791-792 (9th Cir. 2003).  If not, the inquiry ends.

3  |       If so, the next step is to analyze whether the defendants are entitled to

4  |  qualified immunity because the rights asserted were not clearly established at the

5  |  time.  *Id.*  The "relevant, dispositive inquiry in determining whether a right is clearly

6  |  established is whether it would be clear to a reasonable officer that his conduct was

7  |  unlawful in the situation he confronted."  <u>Saucier</u>, at 202.  Although the precise act

8  |  need not have been declared unlawful, its unlawfulness must be apparent in the light

9  |  of pre-existing law.  <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002); *see also* <u>Estate of</u>

10 |  <u>Ford v. Ramirez-Palmer</u>, 301 F.3d 1043, 1050 (9th Cir. 2002).

11 |       Accordingly, a defendant is entitled to qualified immunity if he makes a

12 |  reasonable mistake.  <u>Saucier</u>, 533 U.S. at 205.   "Qualified immunity "shields an

13 |  officer from suit when she makes a decision that, even if constitutionally deficient,

14 |  reasonably misapprehends the law governing the circumstances she confronted."

15 |  <u>Brosseau v. Haugen</u>, 125 S.Ct 596, 599 (2004).  In <u>Brosseau</u>, the Supreme Court

16 |  held that an officer was entitled to qualified immunity because her use of deadly

17 |  force "fell within the 'hazy border between excessive and acceptable force.'"  *Id.* at

18 |  600, *quoting* <u>Saucier</u>, 533 U.S. at 206.

19 |       This standard "'gives ample room for mistaken judgment' by protecting 'all

20 |  but the plainly incompetent or those who knowingly violate the law.'"  <u>Hunter</u>,

21 |  *supra, quoting* <u>Malley v. Briggs</u>, 475 U.S. 335, 343 (1986).  The "accommodation

22 |  for reasonable error exists because 'officials should not err always on the side of

23 |  caution' because they fear being sued."  <u>Hunter</u>, at 228-229, *quoting* <u>Davis v.</u>

24 |  <u>Scherer</u>, 468 U.S. 183, 196 (1984).

25 |       This inquiry is distinct from the initial inquiry into the constitutional

26 |  violation. <u>Saucier</u>, 533 U.S. at 205 (Qualified immunity inquiry "has a further

27 |  dimension"); <u>Estate of Ford v. Ramirez-Palmer</u>, 301 F.3d 1043, 1049 (9th Cir. 2002)

28 |  ("Saucier's key point is that the qualified immunity inquiry is separate from the

    constitutional inquiry").

1       The defendant's mental state, therefore, is only relevant to the qualified

2  immunity test to the extent that it is an element of the alleged constitutional

3  violation. <u>Clement v. Gomez</u>, 298 F.3d 898, 903 (9th Cir. 2002); <u>Jeffers v. Gomez</u>,

4  267 F.3d 895, 911 (9th Cir. 2001); <u>Crawford-El v. Britton</u>, 523 U.S. 574, 587-589

5  (1998) ("Evidence concerning the defendant's subjective intent is simply irrelevant

6  to [qualified immunity]").

7       Accordingly, a defendant may act "maliciously and sadistically to cause

8  harm," and may still act "reasonably" for the purposes of qualified immunity.

9  <u>Marquez v. Gutierrez</u>, 322 F.3d 689, 693 (9th Cir. 2003).  "Courts may not simply

10 stop with a determination that a triable issue of fact exists as to whether prison

11 officials [acted unconstitutionally]; instead, the qualified immunity inquiry is

12 separate from the constitutional inquiry." *Id.*, *quoting* <u>Estate of Ford v. Ramirez-</u>

13 <u>Palmer</u>, 301 F.3d at 1053; *See also* <u>Crawford-El v. Britton</u>, 523 U.S. 574, 587-589

14 (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the

15 defendant's conduct was malicious or otherwise improperly motivated"); <u>Hope v.</u>

16 <u>Pelzer</u>, 536 U.S. 730, 739 (2002) (After finding prison officials violated Eighth

17 Amendment by showing "reckless indifference" to dangerous prison conditions,

18 Court held that "Despite their participation in ... constitutionally impermissible

19 conduct, respondents may nevertheless be shielded from liability for civil damages

20 if their actions did not violate clearly established statutory or constitutional rights of

21 which a reasonable person would have known.") (internal quotations and citations

22

23 omitted).

24      In this case, the evidence will show that Officer Swanson is not personally

25 liable to Inmate Salameh under <u>Bivens</u> because Inmate Salameh cannot establish

26 that Officer Swanson violated Inmate Salameh's Eighth Amendment right by using

27 malicious or sadistic force against him.  Furthermore, even if Inmate Salameh were

28 to establish an Eighth Amendment violation, he cannot establish that Officer

Swanson engaged in any clearly unlawful conduct.  Inmate Salameh claims that

1   Officer Swanson placed handcuffs on him too tightly, held him under the arm in an

2   uncomfortable manner, and banged him into the bars of gates while escorting him to

3   the SHU.  In addition, Inmate Salameh claims that his bare toes were stomped on

4   during the transfer.  Officer Swanson and other BOP staff will testify that Inmate

5   Salameh was indeed handcuffed in accordance with BOP policy on the

6   precautionary use of restraints.  Inmate Salameh was also held on his upper arm

7   according to transfer protocol pertaining to maximum security inmates such as

8   Inmate Salameh.  However, the escort team members did not carry or lift Inmate

9   Salameh up under his arm during the transfer on June 17, 1998.  BOP staff will also

10  testify that Officer Swanson did not bang Inmate Salameh into bars, walls or gates,

11  stomp on his toes, or otherwise use excessive force against him during the transfer.

12  Throughout the transfer as well as immediately afterwards, Inmate Salameh was

13  observed by a number of BOP  members, none of whom observed any injuries on

14  Inmate Salameh.  The evidence will further show that even when Inmate Salameh

15  complained of injuries later in the day, he did not exhibit any injuries which

16  appeared to result from excessive force.

17         In sum, Inmate Salameh cannot establish that Officer Swanson used sadistic

18  or malicious force against him so as to subject him to cruel and unusual

19  \\\

20  \\\

21  \\\

22

23

24

25

26

27

28

1  punishment.  Thus, Inmate Salameh cannot prevail on his claim that Officer

2  Swanson violated his rights under the Eighth Amendment.

3  DATED: January 2 , 2008.          THOMAS P. O'BRIEN
                                    United States Attorney
4                                   LEON W. WEIDMAN
                                    Assistant United States Attorney
5                                   Chief, Civil Division

6

7                                         /s/
                                    _____
                                    KATHERINE M. HIKIDA
8                                   Assistant United States Attorney

9                                   Attorneys for Federal Defendant
                                    JASON SWANSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28