UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MOHAMMAD SALAMEH,                    )      CV 98-8493 SVW (MLGx)
                                     )
                 Plaintiff,          )      COURT'S SUPPLEMENTAL FINDINGS
                                     )
          v.                         )
                                     )
JASON SWANSON,                       )
                                     )
                 Defendant.          )
_____    )

     The Court agrees with the Government's Proposed Findings of Fact
and Conclusions of Law.  The Court found Officer Swanson's testimony
to be credible.  Officer Swanson's testimony was corroborated by
Lieutenant Garcia, who was also credible.  The Court found the
Plaintiff to be untruthful in his description of being pushed and
slammed into gate bars and walls, and also untruthful regarding his
testimony of overly tight handcuffs and officers intentionally
stepping on his toes.  There were other Government witnesses (Franco,
Velasquez, Bengford) who would have been in a position to observe
Plaintiff's injuries, if, in fact, Plaintiff's injuries were the
result of Defendant's actions.  The Court found these Government
witnesses credible.

The Court also found Officer Navato to be credible when he testified that he observed no injuries when Plaintiff was placed in his cell at the conclusion of the transfer.   (Gov. Findings, ¶ 29.) The prison guards were further corroborated by Physician's Assistant Pagaduan, who did not observe injuries consistent with Plaintiff's claims.

In short, the Court found Plaintiff to be untruthful.   As such, Plaintiff failed to sustain his burden in the case.


IT SO ORDERED.

DATED: __5/30/08_____

_____
STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

THOMAS P. O'BRIEN
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
KATHERINE M. HIKIDA
Assistant United States Attorney
Cal. Bar No. 153268
    Room 7516, Federal Building
    300 North Los Angeles Street
    Los Angeles, California  90012
    Telephone:  (213) 894-2285
    Facsimile:  (213) 894-7819
    katherine.hikida@usdoj.gov

Attorneys for Federal Defendant
JASON SWANSON

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| MOHAMMAD SALAMEH, | ) | NO. CV 98-8493-SVW(MLGx) |
|     Plaintiff, | ) | JUDGMENT FOR DEFENDANT AFTER COURT TRIAL |
|     v. | ) | [PROPOSED] |
| JASON SWANSON, | ) | Before the Honorable Stephen V. Wilson |
|     Defendant. | ) | |

This case was tried on January 8, 2008, before this Court

sitting without a jury.

    Pursuant to the Findings of Fact and Conclusions of Law filed

on May 30 ___, 2008,

    IT IS ADJUDGED that judgment is entered in favor of defendant

and against plaintiff.

DATED: May 30 , 2008.

_____
UNITED STATES DISTRICT JUDGE

1  Presented by:

2  THOMAS P. O'BRIEN
   United States Attorney
3  LEON W. WEIDMAN
   Assistant United States Attorney
4  Chief, Civil Division

5  _Katherine M. Hikida_
   _____

6  KATHERINE M. HIKIDA
   Assistant United States Attorney

7
   Attorneys for Federal Defendant
8  JASON SWANSON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THOMAS P. O'BRIEN
United States Attorney
LEON W. WEIDMAN
Assistant United States Attorney
Chief, Civil Division
KATHERINE M. HIKIDA
Assistant United States Attorney
Cal. Bar No. 153268
     Room 7516, Federal Building
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone:  (213) 894-2285
     Facsimile:  (213) 894-7819
     katherine.hikida@usdoj.gov

Attorneys for Federal Defendant
JASON SWANSON

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MOHAMMAD SALAMEH, | NO. CV 98-8493-SVW(MLGx) |
| Plaintiff, | DEFENDANT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW [PROPOSED] |
| v. | Trial: 1/8/08 at 9:00 a.m. |
| JASON SWANSON, | Before the Honorable |
| Defendant. | Stephen V. Wilson |

1      The case was tried on January 8, 2008, before United States District Judge
2 Stephen V. Wilson.  Appearances were: (1) for plaintiff, Joyce Ellen Rosendahl and
3 (2) for defendant, Thomas P. O'Brien, United States Attorney, Leon W. Weidman,
4 Assistant United States Attorney, Chief, Civil Division by Katherine M. Hikida,
5 Assistant United States Attorney.

6      Having heard the testimony of plaintiff, his witness, and defendant's
7 witnesses, having studied the documentary evidence, and having given the matter
8 due consideration, the Court renders judgment on the merits against plaintiff
9 pursuant to Fed.R.Civ.P. 58 and makes the following findings of fact and
10 conclusions of law:

11 FINDINGS OF FACT

12      1.  Inmate Salameh was incarcerated at the USP Lompoc from February 4,
13 1998 to September 26, 2002.  <u>See</u> Ex. 21 attached to Decl. of Salvador R. Franco
14 ("Franco Decl.") .  He was transferred to the Administrative Maximum Facility
15 ("ADX") in Florence, Colorado on September 26, 2002, where he is presently
16 incarcerated.  <u>See</u> Decl. of Jason Swanson ("Swanson Decl."), ¶ 2; Decl. of Robert
17 Garcia ("Garcia Decl."), ¶ 3.

18      2.  Inmate Salameh was convicted of the 1993 World Trade Center bombing
19 and was sentenced originally to 240 years (later amended to 116 years and 11
20 months with 5 years supervision) for Conspiracy  to Damage Building by Explosive
21 Device, Explosive Destruction of Property, Explosive Destruction of Government
22 Property, Interstate Transport of Explosives, Destruction of Motor Vehicle, Assault
23 on Federal Officer, Using or Carrying a Destructive Device During a Crime of
24 Violence, and False Statement on Immigration and Naturalization Service
25 Application for Temporary/Permanent Resident Alien Status, in violation of 18
26 U.S.C. § 371, 18 U.S.C. § 844(I) & 2, 18 U.S.C. § 844(D) & 2, 18 U.S.C. §§ 3334
27 & 2, 18 U.S.C. § 111 & 2, 18 U.S.C. § 924(c) & 2, 18 U.S.C. § 1546 (a),
28 respectively.  <u>See</u> Ex. 32 attached to Decl. of Joseph Fitzmaurice ("Fitzmaurice

2

1   Decl."); Ex. 33 attached to Decl. of Jamie Bengford ("Bengford Decl."); Swanson

2   Decl., ¶ 2; Bengford Decl., ¶ 5; Decl. of Todd Manspeaker ("Manspeaker Decl."), ¶

3   3; Decl. of Raymond Velasquez ("Velasquez Decl."), ¶ 4; Franco Decl., ¶ 3.

4       3.  In 1998, the inmate population at USP Lompoc consisted on average of

5   1,035 to 1,100 inmates.  Decl. of Edwin Navato ("Navato Decl."), ¶ 2; Garcia Decl.,

6   ¶ 2.  Inmate Salameh was not the only inmate at USP Lompoc convicted of terrorist

7   activity, murder, bombing, anti-government stance, and other serious violence.

8   Swanson Decl., ¶ 3.  Other inmates had similar serious convictions.  Id.  In fact, in

9   1998, the population of inmates at USP Lompoc included the most serious, violent,

10  and heinous offenders in the Western Region including bank robbers, gang leaders,

11  drug dealers, multiple murderers, murderers of law enforcement officers, child

12  rapists, and terrorists.  See Decl. of Bernie Janusz ("Janusz Decl."), ¶ 2; Fitzmaurice

13  Decl., ¶ 2; Bengford Decl., ¶ 2; Navato Decl., ¶ 2; Swanson Decl., ¶ 3; Garcia Decl.,

14  ¶ 2 .  These inmates required high and/or maximum security because of their lengthy

15  sentences and risks for escape.  Fitzmaurice Decl., ¶ 2; Navato Decl., ¶ 2; Bengford

16  Decl., ¶ 2.

17      4.  It was not uncommon for USP Lompoc staff to respond to threats,

18  assaults, riots, and other disturbance on a regular basis.  See Janusz Decl., ¶ 2;

19  Fitzmaurice Decl., ¶ 3; Bengford Decl., ¶ 3.

20      5.  In 1998, the tension at USP Lompoc was high because of racial problems

21  between black and white inmates.  Fitzmaurice Decl., ¶ 3; Bengford Decl., ¶ 3.

22  Between June 15, 1998 to June 17, 1998, the Special Investigative Services ("SIS")

23  office at USP Lompoc received information that both black and white inmates were

24  stockpiling weapons due to racial tensions and that there was going to be a violent

25  conflict between members of the Sunni Muslim Community and the Odinist

26  Community.  Garcia Decl., ¶ 4.  During this time, Lieutenant Fitzmaurice received

27  information from confidential informants and observations by recreation and

28  chaplancy staff and housing unit officers that the tension was at a boiling point

between black and white inmates.  Fitzmaurice Decl., ¶ 4; Bengford Decl., ¶ 4.

6.  In the morning of June 17, 1998, Lieutenant Fitzmaurice briefed the Warden and Executive Staff on the intelligence that was gathered on the racial problem.  Fitzmaurice Decl., ¶ 4; Manspeaker Decl., ¶ 2.  The Warden at USP Lompoc made the decision that morning to lockdown the institution.  Fitzmaurice Decl., ¶ 4; Bengford Decl., ¶ 4; Manspeaker Decl., ¶ 2.  A decision was made to place inmates in the SHU who were leadership figures of the various inmate groups involved including the Aryan Brotherhood, Odonists, Sunni Muslims, and African American inmates from Washington, D.C.  Id.  Lieutenant Fitzmaurice generated the two lists of inmates (white and black inmates) to be placed in SHU. Fitzmaurice Decl., ¶ 4.

7.  At the time, there were many reasons why Inmate Salameh was placed on one of these lists.  Fitzmaurice Decl., ¶ 5.  Inmate Salameh was a prominent member of the Sunni Muslims.  Id.  He has a Jihaddist philosophy, which means that he harms or kills others to further his religious belief even if it means he would lose his own life.  Fitzmaurice Decl., ¶ 5.  Inmate Salameh also had recently sent out a Last Will Statement/Islamic Funeral and Burial Arrangements Declaration on June 9, 1998.  Id.; Ex. 19 attached to Fitzmaurice Decl.  Inmate Richard Scutari, the leader of the Odonists group at USP Lompoc also sent a Last Will and Testament that same week, which caused concern because it was unusual for both of them to do so. Fitzmaurice Decl., ¶ 5.  Inmate Salameh was also seen associating with Inmate Anthony Austin, a D.C. inmate, who was later known for attempting to organize Sunni Muslims to attack the members of the Aryan Brotherhood.  Id.  Furthermore, it was reasonable to believe that prison White supremacist gangs would have targeted Inmate Salameh and his cohorts.  Bengford Decl., ¶ 5.  Because there was a perceived threat to Muslim inmates, it was not unusual for Inmate Salameh to have been detained in SHU until the threat was investigated.  Id.   8.  Based on the information gathered regarding racial tensions at USP Lompoc and a possible

4

1  violent conflict, 19 inmates were identified as potential participants. Garcia Decl., ¶
2  4.  Inmate Salameh, a high-profile inmate and a known member of the Sunni
3  Muslim Community, was one of the inmates who was identified as a potential
4  participant.  Id.  The 19 inmates including Inmate Salameh were transferred to SHU
5  on June 17, 1998.  Id.; Fitzmaurice Decl., ¶ 6.

6       9.  Lieutenant Garcia supervised approximately 5 to 10 transfers of inmates
7  to SHU at USP Lompoc on June 17, 1998.  Garcia Decl., ¶ 4.  Lieutenant Garcia
8  supervised the two-member escort team that was assigned to transfer Inmate
9  Salameh from the M Unit, which was in the general population, to 10.  SHU.  Id.,
10  ¶ 5.

11       10.  The escort team consisted of two Special Operations Resource Team
12  ("SORT") members, which are staff who volunteer for this duty and are highly
13  trained in tactical scenarios and disturbance control.  Id.; Janusz Decl., ¶ 4.  SORT
14  members qualify for the team by excelling at a physical fitness test, obstacle course,
15  use of firearms, and other requirements.  Janusz Decl., ¶ 4.  Further, SORT members
16  must be skilled at problem-solving , controlling highly stressful situations, and at all
17  times maintaining the honor and integrity of the BOP.  Id.

18       11.  Inmate Salameh was placed in handcuffs while being transferred in
19  accordance with Bureau of Prisons ("BOP") policy, which authorized BOP staff to
20  apply physical restraints in situations requiring precautionary restraints, particularly
21  in the movement or transfer of inmates (e.g., the use of handcuffs while moving
22  inmates to and from a cell in detention, escorting an inmate to SHU pending
23  investigation, etc.).  Garcia Decl., ¶ 6; Ex. 40 attached thereto; Janusz Decl., ¶ 5;
24  Ex. 40 attached thereto.  Inmate Salameh as well as the other 18 inmates were
25  placed in administrative detention in SHU pending an investigation of the potential
26  racial conflict.  Garcia Decl., ¶ 6; Bengford Decl., ¶ 7; Ex. 12 attached thereto.
27  Inmate Salameh was in handcuffs for the brief amount of time that it took the escort
28  team to transfer him from the general population housing unit to his cell in SHU.

1   Garcia Decl., ¶ 6.

2       12.  Case Manager Janusz and Officer Swanson were the two-member escort
3   team that was assigned to transfer Inmate Salameh from the M Housing Unit to
4   SHU on June 17, 1998. Janusz Decl., ¶¶ 4, 5; Swanson Decl., ¶ 5. During Inmate
5   Salameh's escort on June 17, 1998, both Case Manager Janusz and Officer Swanson
6   wore their SORT uniforms which included helmets, gas masks, batons, black jump
7   suits, and other gear. Janusz Decl., ¶ 4; Swanson Decl., ¶ 5. Both Case Manager
8   Janusz and Officer Swanson would have had their helmets and full gear on except
9   for the gas masks which were not used because no tear gas was deployed. Id.

10       13.  Officer Swanson did not recall any particular interaction with Inmate
11   Salameh prior to June 17, 1998, although he recalls seeing Inmate Salameh in the
12   company of other Muslim inmates.  Swanson Decl., ¶ 4. Inmate Salameh's co-
13   defendants in the 1993 World Trade Center bombing were also housed at USP
14   Lompoc in 1998, which among others included Fadil Abdelgani and Mahmud
15   Abouhalima. Swanson Decl., ¶ 4.  Officer Swanson specifically recalled speaking
16   with Inmate Abdelgani and Inmate Abouhalima in USP Lompoc's Medical
17   Department's second floor law library cell. Swanson Decl., ¶ 4. The conversation
18   was memorable because Inmate Abdelgani became argumentative with Officer
19   Swanson when Inmate Abdelgani was in the law library, which is a cell that is
20   secured when an inmate is using it. Id. Inmate Abdelgani asked if Inmate
21   Abouhalima could join him in the law library cell to assist Inmate Abouhalima with
22   his legal issue. Swanson Decl., ¶ 4.  Officer Swanson informed Inmate Abdelgani
23   that it was inappropriate for Inmate Abouhalima to be in the law library cell with
24   him. Id.

25       14.  Officer Swanson participated in escorting up to 20 inmates from the
26   general population to SHU on June 17, 1998. Swanson Decl., ¶ 5. He did not have
27   to use any force to move any inmates to SHU on that date. Id. He was later

28

informed that Inmate Salameh was one of the inmates who was escorted that day but did not specifically recall escorting Inmate Salameh, distinct from the other inmates. Swanson Decl., ¶ 5.  Officer Swanson recalled that the inmates from the M Unit walked to SHU, which includes the H and I Housing Units, under their own power and were not physically lifted or carried by members of the escort team and the inmates were not abused in any manner en route to SHU or at any time during the escorts/transfers on June 17, 1998. Id.

15.  On June 17, 1998, Inmate Salameh was escorted from the M Housing Unit to the I Housing Unit in SHU. Garcia Decl., ¶ 7; Janusz Decl., ¶ 5. The escort began when Lieutenant Garcia arrived in the M Housing Unit. Garcia Decl., ¶ 7. Inmate Salameh was on the second floor in his cell number C-5. Id.  He was advised to submit to handcuffs, to which he complied. Garcia Decl., ¶ 7; Janusz Decl., ¶ 5.

16.  Although Officer Swanson did not specifically recall placing handcuffs on Inmate Salameh, Officer Swanson would have known if Inmate Salameh's handcuffs were applied too tightly because his standard practice in applying handcuffs is to take a finger and place it near the inside of the ring before and as Officer Swanson tightened each handcuff.  Swanson Decl., ¶ 6.  This ensured that there was enough space between the wrist and the handcuff. Swanson Decl., ¶ 6. Officer Swanson repeats the same procedure on the other wrist. Id.  If the handcuffs were applied too tightly, Officer Swanson would unkey the handcuffs and loosen them without applying any additional pressure on Inmate Salameh's wrists or hands. Swanson Decl., ¶ 6.

17.  Officer Swanson did not recall any inmates complaining about their handcuffs being too tight on June 17, 1998. Id.  Case Manager Janusz also did not recall Inmate Salameh complaining that his hand restraints were too tight. Janusz Decl., ¶ 7. Lieutenant Garcia did not recall Inmate Salameh complaining about any injury to his hands or wrists due to the handcuffs. Garcia Decl., ¶ 11.  If

7

1  an inmate had complained about his handcuffs being too tight, Officer Swanson
2  would have checked the handcuffs and unkeyed them if necessary to loosen them as
3  described above.  Swanson Decl., ¶ 6.  However, because it is Officer Swanson's
4  standard practice to place a finger near the inside of the ring before and as he
5  tightens each handcuff, inmates do not complain that the handcuffs Officer Swanson
6  places on them are too tight.  Id.

7      18.  Once Inmate Salameh was handcuffed, he was asked to step back and the
8  door of his cell number C-5 was opened.  Garcia Decl., ¶ 7.  The two-member SORT
9  team walked with Inmate Salameh down the hall of the second floor and down one
10 flight of stairs.  Garcia Decl., ¶ 7; Janusz Decl., ¶ 5;  When practical, Inmate
11 Salameh was in the middle and each SORT team member were on either side of
12 Inmate Salameh.  Garcia Decl., ¶ 7.  At all times during the escort, Inmate Salameh
13 walked without assistance.  Id.; Janusz Decl., ¶ 6; Swanson Decl., ¶ 5.  The two
14 SORT members who escorted Inmate Salameh never carried him or lifted him up
15 under his arms so his feet were not touching the ground or so Inmate Salameh had to
16 tiptoe.  Garcia Decl., ¶ 7; Swanson Decl., ¶ 5; Janusz Decl., ¶ 6.

17     19.  Lieutenant Garcia was walking with them during the entire transfer from
18 the M Housing Unit to the I Housing Unit.  Garcia Decl., ¶ 7.  Lieutenant Garcia
19 guided the escort out of the M Housing Unit.  Id.  There were no significant events
20 during the passage from Inmate Salameh's cell in the M Housing Unit to the door of
21 the M Housing Unit.  Garcia Decl., ¶ 7.  Lieutenant Garcia was watching and had a
22 clear view of Inmate Salameh's escort at all times, and did not observe or hear any
23 shoving, pushing, or slamming into gates, bars or walls; or stepping on Inmate
24 Salameh's toes or feet; or any conduct which could be considered mistreatment or
25 abusive.  Id.

26     20.  The SHU consisted of two separate housing units, H and I.  Garcia Decl.,
27 ¶ 8; Fitzmaurice Decl., ¶ 7.  The main door to the SHU is in the H Housing Unit.  Id.
28 After exiting the M Housing Unit, Officer Swanson, Case Manager Janusz, Inmate

1  Salameh, and Lieutenant Garcia walked directly to the H Housing Unit. Id. The H
2  Housing Unit entrance in SHU is a few feet away from the M Housing Unit door
3  and directly across from each other. Garcia Decl., ¶ 8.

4      21. Lieutenant Manspeaker specifically remembered seeing some of the
5  SORT members escorting Inmate Salameh from the M Housing Unit when he
6  happened to be walking the East corridor as Inmate Salameh was coming out of the
7  M Housing Unit. Manspeaker Decl., ¶ 4. Lieutenant Manspeaker saw Lieutenant
8  Garcia, the SORT leader, but did not recall recognizing the SORT members because
9  he believed they were wearing helmets with the face shields down. Id. Lieutenant
10 Manspeaker remembered that Inmate Salameh called out to him when Inmate
11 Salameh saw him in the corridor and asked Lieutenant Manspeaker why Inmate
12 Salameh was going to the SHU. Id. Lieutenant Manspeaker told Inmate Salameh
13 something to the effect that there was a lockdown and Inmate Salameh would be
14 informed of the reason for his placement. Manspeaker Decl., ¶ 4.

15     22. Lieutenant Manspeaker specifically recalled that Inmate Salameh walked
16 without assistance. Manspeaker Decl., ¶ 5. Inmate Salameh was not carried or
17 lifted up under his arms so his feet were not touching the ground or so Inmate
18 Salameh had to tiptoe. Id. Lieutenant Manspeaker did not recall Inmate Salameh
19 complaining about any injury to his hands or wrists due to the hand restraints or
20 injury to his face, feet, or any other part of his body and would certainly remember
21 if he had done so. Manspeaker Decl., ¶ 5. Lieutenant Manspeaker did not see any
22 cuts, bruises, or marks on Inmate Salameh's face or any blood on him. Id. If he had
23 seen any cuts, bruises, or marks on Inmate Salameh's face or any injury to his hands
24 or wrists, or any blood on him, Lieutenant           Manspeaker would have
25 informed Lieutenant Garcia and called for medical staff to see Inmate Salameh at
26 the SHU. Manspeaker Decl., ¶ 5.

27     23. The door to the H Unit was opened and the two-member escort team
28 with Inmate Salameh and Lieutenant Garcia entered and then the door was locked

behind the four of them.  Garcia Decl., ¶ 8.  On June 17, 1998, Officer Velasquez was working as the H Housing Unit Number 2 Officer with a schedule of 8:00 a.m. to 4:00 p.m., which on the roster appeared as "SHU #2."  See Ex. 35 attached to Velasquez Decl.; Velasquez Decl., ¶ 3.  As the H Housing Unit Number 2 Officer, Officer Velasquez would have opened the H Housing Unit door for the SORT members and inmates to enter on June 17, 1998.  Velasquez Decl., ¶ 3.  Officer Velasquez did not recall seeing Inmate Salameh submit to the visual strip search but he described the standard procedure used by staff.  Id.,¶ 5.  Inmate Salameh's hand restraints would have been removed while the visual strip search was conducted.  Id. After Inmate Salameh submitted to the visual search, then he would have changed out of his general population clothes, including shoes, and into the authorized SHU clothes.  Velasquez Decl., ¶ 5.  Once the visual search was completed and his clothes were exchanged, he would have been placed in hand restraints again and then the H Housing Unit Strip Cell door on the other side would have been opened. Id.  The visual strip search, clothes exchange and walk through the H Housing Unit to the I Housing Unit would have been approximately 10 to 15 minutes, or sometimes faster.  Velasquez Decl., ¶ 5.

24.   Officer Velasquez did not recall Inmate Salameh complaining about any injury to his hands or wrists due to the hand restraints or injury to his face, feet, or any other part of his body.  Velasquez Decl., ¶ 6.  Officer Velasquez did not see any cuts, bruises, or marks on Inmate Salameh's face or any blood on him.  Id.  He did not see any indentations, grooves, or broken skin on Inmate Salameh's hands or wrists.  Velasquez Decl., ¶ 6.  If Officer Velasquez had seen any cuts, bruises, or marks on his face, or any injury to his hands or wrists, or any blood on him, Officer Velasquez would have informed Lieutenant Garcia, other Lieutenants and called for medical staff.  Id.  However, Officer Velasquez did not see or hear Inmate Salameh or any other inmate getting assaulted by staff or inmates while he was in the H Housing Unit that day.  Velasquez Decl., ¶ 6.  Officer Velasquez would have heard

1   or seen the incident if the staff had to use force on Inmate Salameh or any other
2   inmates on June 17, 1998. <u>Id</u>. He did not hear or see Inmate Salameh complain of
3   being assaulted or injured either before, during, or after the visual strip search and
4   the subsequent walk through the H Housing Unit to the I Housing Unit. Velasquez
5   Decl., ¶ 6. Officer Velasquez did not receive any report from staff or inmates that
6   Inmate Salameh was assaulted during the escort. <u>Id</u>. He would have remembered if
7   Inmate Salameh was assaulted in the SHU. Velasquez Decl., ¶ 6. Officer Velasquez
8   would have been required to report such an incident to his supervisor and/or to write
9   a memorandum concerning such an incident. <u>Id</u>. Officer Velasquez did not have
10  any further contact with Inmate Salameh after he was moved to the I Housing Unit
11  of the SHU. Velasquez Decl., ¶ 6.

12         25.   Lieutenant Garcia did not recall any significant event during the passage
13  from the hallway corridor to the entrance of the H Housing Unit or as they entered
14  the H Housing Unit; the door was locked behind them. <u>Id</u>. Lieutenant Garcia was
15  watching the escort team's actions as well as Inmate Salameh and did not observe or
16  hear any abusive conduct towards Inmate Salameh, including any shoving, pushing,
17  or slamming into gates, bars or walls; or stepping on Inmate Salameh's toes or feet.
18  <u>Id</u>. The two-member escort team placed Inmate Salameh in a strip-search cell,
19  which was located on the left side of the main door to the H Housing Unit. Garcia
20  Decl., ¶ 8; Fitzmaurice Decl., ¶ 8. Inmate Salameh remained in the holding cell by
21  himself for a visual strip search. Fitzmaurice Decl., ¶ 8. Inmate Salameh was given
22  a visual search and then given new clothes appropriate for inmates held in SHU.
23  Garcia Decl., ¶ 8. Lieutenant Garcia recalled that Inmate Salameh complied with
24  this procedure without incident. <u>Id</u>. He recalled that at some point during this time
25  Inmate Salameh asked Lieutenant Garcia why he was being taken to SHU and he
26  recalled telling Inmate Salameh that he would be informed by the appropriate staff
27  shortly. Garcia Decl., ¶ 8.

28

11

1    26. After the visual search, Inmate Salameh was escorted to his final
2 destination which was in the I Housing Unit, that is the second housing unit in SHU.
3 Garcia Decl., ¶ 9. During the walk to the I Housing Unit, Lieutenant Garcia did not
4 recall Inmate Salameh resisting or causing the escort team to use any force. Id. He
5 complied with the escort team and there were no significant events during this walk
6 from the H Unit to the I Housing Unit. Garcia Decl., ¶ 9. Lieutenant Garcia was
7 watching during the entire escort and did not observe or hear any mistreatment or
8 abusive conduct towards Inmate Salameh. Id.

9    27. The route that Inmate Salameh took would have been as seen in the
10 videotape of the reenactment. See Ex. 10 attached to Fitzmaurice Decl.; Fitzmaurice
11 Decl., ¶ 10. There was no actual videotape of Inmate Salameh's escort on June 17,
12 1998 because there was no use of force or other significant event that would have
13 prompted the use of the video camera. Fitzmaurice Decl., ¶ 10.

14    28. On or about 3:25 p.m. on June 17, 1998, Officer Edwin Navato noted in
15 the I Housing Unit logbook that he received Inmate Salameh in the I Housing Unit.
16 See Ex. 36 attached to Navato Decl.; Navato Decl., ¶ 4. Officer Navato recalled that
17 the SORT team brought in inmates to the SHU from the general population. Id. He
18 relieved other staff in the I Housing Unit and then he assumed the duties as the
19 Officer-in-Charge of the I Housing Unit. Navato Decl., ¶ 4. Officer Navato
20 recalled checking the incoming inmates, including their name and background
21 information, their appearance, and other information for processing them. Id. He
22 also assigned the cells and cell-mates for the inmates who were brought into the I
23 Unit. Navato Decl., ¶ 4. Officer Navato specifically recalled Inmate Salameh
24 coming into the I Housing Unit. Id. Inmate Salameh was barefoot and appeared
25 furious that Muslims were taken to SHU because he did not know the reason for the
26 lock-up. Navato Decl., ¶ 4. Inmate Salameh was asking for his personal shoes and
27 property. Id. Personal shoes are not allowed in SHU because this property would
28 have to be stored until Inmate Salameh returned to the general population. Navato

1  Decl., ¶ 4. Officer Navato did not recall specifically, however, Inmate Salameh may
2  have refused to wear the shoes that were given to inmates in SHU. Id.

3       29. As part of his duties, Officer Navato assessed Inmate Salameh's
4  appearance at the time he came in to the I Housing Unit. Navato Decl., ¶ 5. Officer
5  Navato did not see any injuries to Inmate Salameh's face or any other part of his
6  body. Id. Officer Navato did not observe any cuts, scratches, bruises, or other
7  injuries on Inmate Salameh nor did he see any blood on Inmate Salameh. Navato
8  Decl., ¶ 5. If Officer Navato had observed any of the foregoing, he would have
9  reported it according to BOP procedure and medical assistance would have been
10 summoned. Id. However, because there were no injuries to report, Officer Navato
11 did not report anything with respect to Inmate Salameh either during or after the
12 escort on June 17, 1998. Navato Decl., ¶ 5. Officer Navato testified that Inmate
13 Salameh walked on his accord while in the I Housing Unit. Id. Officer Navato did
14 not recall seeing or hearing that Inmate Salameh's toes were stepped on at any time.
15 Navato Decl., ¶ 5. Inmate Salameh did not complain to Officer Navato of any
16 injuries. Id. Officer Navato did not recall calling for medical assistance for Inmate
17 Salameh. Navato Decl., ¶ 5.

18      30. Officer Navato testified that Inmate Salameh did not report that the
19 SORT team assaulted him during the escort from the general population. Navato
20 Decl., ¶ 6. Moreover, Officer Navato also testified that he did not witness any of the
21 members of the SORT team push, bang, or pull Inmate Salameh into the walls, bars,
22 or gates or step on Inmate Salameh's toes, either intentionally or otherwise. Id.
23 Officer Navato did not recall Inmate Salameh complaining to him about being
24 treated in a forceful or abusive manner. Navato Decl., ¶ 6. Officer Navato did not
25 observe any unusual event or activity such as assault or disturbance with respect to
26 the transport of Muslim inmates to the I Housing Unit on June 17, 1998. Id., ¶ 7.
27 Officer Navato did not note any such incident in the logbook. Id. While Inmate
28 Salameh was in the I Housing Unit, he did not report any assault or injuries to

1  Officer Navato.  Navato Decl., ¶ 7.  Officer Navato testified that the SORT team
2  acted professionally at all times in the I Housing Unit.  Id., ¶ 6.

3      31.  When they arrived in the I Housing Unit, Lieutenant Garcia  recalled
4  instructing the two-member escort team to place Inmate Salameh in a cell.  Garcia
5  Decl., ¶ 10.  On June 17, 1998, upon his arrival in the I Unit of SHU, Inmate
6  Salameh was placed in cell C-15 with another Muslim inmate, Fadil Abdelgani, who
7  was also convicted for his actions in the first World Trade Center bombing.  See
8  Ex. 32 attached to Fitzmaurice Decl.; Swanson Decl., ¶ 4.

9      32.  Pursuant to BOP policy, inmates are not released from their restraints
10 before being secured behind the cell doors.  Id.  As soon as Inmate Salameh had
11 been secured in the cell, Lieutenant Garcia recalled asking him to place his hands
12 through the food slot so that Lieutenant Garcia could remove his handcuffs in
13 accordance with BOP policy.  Garcia Decl., ¶ 10.  Lieutenant Garcia removed
14 Inmate Salameh's handcuffs by placing his hand on Inmate Salameh's arm while
15 Lieutenant Garcia unkeyed the handcuffs, and then holding onto the handcuffs while
16 each ring was opened.  Id.  He did not touch Inmate Salameh other than to remove
17 his handcuffs.  Garcia Decl., ¶ 10.

18     33.  Lieutenant Garcia did not recall Inmate Salameh complaining about any
19 injury to his hands or wrists due to the handcuffs or injury to his face, feet, or any
20 other part of his body.  Garcia Decl., ¶ 11.  Specifically, Lieutenant Garcia was face-
21 to-face with Inmate Salameh when he removed his handcuffs.  Id.  Lieutenant
22 Garcia did not see any cuts, bruises, or marks on Inmate Salameh's face or any
23 blood on him.  Id.  Lieutenant Garcia was able to see Inmate Salameh's hands and
24 wrists when he removed his handcuffs.  Garcia Decl., ¶ 11.  Lieutenant Garcia did
25 not see any indentations, grooves, or broken skin on Inmate Salameh's hands or
26 wrists.  Id.  If Lieutenant Garcia had seen any cuts, bruises, or marks on Inmate
27 Salameh's face, or any injury to his hands or wrists, or any blood on him, Lieutenant
28

14

1 Garcia would have immediately ordered the escorting staff to call for medical
2 assistance. Garcia Decl., ¶ 11. Lieutenant Garcia would also have reported
3 the injuries to the Captain and would have instructed staff to prepare memorandums,
4 which was standard procedure. Id. Lieutenant Garcia did not prepare any
5 memorandum or other document reporting on the escort which occurred
6 on June 17, 1998. Garcia Decl., ¶ 11. He did not take any of these steps because he
7 did not observe Inmate Salameh suffer any injuries or see any injuries on him. Id.
8 Inmate Salameh did not complain of any injuries to Lieutenant Garcia during or
9 after the escort on June 17, 1998. Garcia Decl., ¶ 11. The escort went according to
10 plan without any injury to staff or Inmate Salameh. Id.

11     34. While the supervisor of the escort team, Lieutenant Garcia did not
12 observe any actions by his subordinates which were not appropriate or not within
13 the established policies. Garcia Decl., ¶ 12. At no time did he observe Inmate
14 Salameh being assaulted by the escort team or having excessive force used against
15 him. Id. Lieutenant Garcia did not and would not have acquiesced in such conduct
16 and would have reported it if he had observed such conduct. Garcia Decl., ¶ 12.

17     35. At all times during the escort, Officer Swanson was in Case Manager
18 Janusz's sight and immediate area. Janusz Decl., ¶ 6. Case Manager Janusz
19 testified that no one used force to subdue or control Inmate Salameh when he
20 entered the H Housing Unit with Officer Swanson and Lieutenant Garcia. Id. If
21 anyone had done so, Case Manager Janusz would have notified Lieutenant Garcia
22 who was present during the escort of Inmate Salameh and also would have prepared
23 a memorandum reporting on any use of force. Janusz Decl., ¶ 6. Officer Swanson
24 and Case Manager Janusz did not and would not have shoved, pushed, or slammed
25 Inmate Salameh into gates, bars or walls; or stepped on Inmate Salameh's toes or
26 feet. Id. Case Manager Janusz did not see or hear anyone commit any conduct
27 which could be considered mistreatment or abuse of Inmate Salameh. Janusz Decl.,
28 ¶ 6.

36. Case Manager Janusz did not recall Inmate Salameh complaining about any injury to his hands or wrists due to the hand restraints or injury to his face, feet, or any other part of his body. Janusz Decl., ¶ 10. Had Inmate Salameh complained about any injury, Janusz would have informed Lieutenant Garcia and called for medical assistance. Id. Case Manager Janusz did not see any cuts, bruises, or marks on Inmate Salameh's face or any blood on him. Id. He also did not see any indentations, grooves, or broken skin on Inmate Salameh's hands or wrists. Janusz Decl., ¶ 10. If he had seen any cuts, bruises, or marks on Inmate Salameh's face or any injury to his hands or wrists, or any blood on him, Case Manager Janusz would have informed Lieutenant Garcia and called for medical staff. Id. He would also have prepared a memorandum. Janusz Decl., ¶ 10. However, Case Manager Janusz did not take any of these steps because he did not observe Inmate Salameh suffer any injuries or see any injuries on him. Id.

37. As a Case Manager, Janusz made weekly SHU rounds, which was in addition to going to SHU to assist inmates in his caseload. Id., ¶ 11. While Case Manager Janusz was in SHU, he did not recall Inmate Salameh telling him or others that he was assaulted by the SORT members on June 17, 1998. Id. If he had done so, Janusz would have reported it and written a memorandum accordingly. Id.

38. Officer Swanson testified that he did not have any inmates resist or fight him and the other escort team member. Id. Officer Swanson did not push or pull any inmate into the walls, bars, gates or other areas on June 17, 1998. Swanson Decl., ¶ 7. If he had to use force necessary to control Inmate Salameh, he would have remembered doing so. Id. If force needed to be used, the use of force procedure would have to be followed including videotaping the incident, calling additional staff to assist, using less than lethal weapons, and other security measures. Swanson Decl., ¶ 7. Additionally, each escort member would have to report the incident in writing. Id. Officer Swanson did not prepare any report with

16

1  respect to Inmate Salameh's transfer on June 17, 1998, because there was no need to
2  file a report as the transfer was uneventful and no incidents occurred.  Id.

3      39.  Officer Swanson did not observe any cuts, scratches, bruises, or other
4  injuries on Inmate Salameh nor did he see any blood on Inmate Salameh.  Swanson
5  Decl., ¶ 8.  If he had observed any of the foregoing, he would have reported it
6  according to BOP procedure and medical assistance would have been summoned.
7  Id.  However, because there were no injuries to report, Officer Swanson did not
8  report anything with respect to Inmate Salameh either during or after the escort on
9  June 17, 1998.  Id.

10     40.  Furthermore, the inmates that Officer Swanson escorted walked on their
11 own accord to the H or I Housing Units of SHU.  Swanson Decl., ¶ 8.  Officer
12 Swanson did not recall stepping on Inmate Salameh's toes at any time.  Id.  It is his
13 normal practice to maintain a reasonable distance between the inmates and himself
14 without compromising security.  Id.  During the entire time the inmates were
15 escorted on June 17, 1998, Officer Swanson did not have to use any force.  Swanson
16 Decl., ¶ 8.  Further, he did not step on any inmate's toes.  Id.  If he had stepped on
17 Inmate Salameh's toes, he would have remembered and documented it.  Id.

18     41.  In all, Inmate Salameh's transfer from the M Housing Unit to SHU was
19 uneventful and unmemorable to Officer Swanson.  Swanson Decl., ¶ 8.  Officer
20 Swanson did not recall any incidents occurring on June 17, 1998, which bore any
21 resemblance to the actions Inmate Salameh alleged and would certainly have
22 remembered such events had they occurred.  Id.

23     42.  Moreover, Officer Swanson also did not witness any of the other
24 members of the escort team push, bang, or pull Inmate Salameh into the walls, bars,
25 or gates, or step on Inmate Salameh's toes, either intentionally or otherwise.
26 Swanson Decl., ¶ 9.  He did not recall Inmate Salameh complaining to him about
27 being treated in a forceful or abusive manner.  Id.  He also did not recall Inmate
28

17

1  Salameh complaining to anyone on June 17, 1998, about being treated in a forceful
2  or abusive manner.  Id.

3      43.  Special Investigative Specialist Officer Jamie Bengford provided Inmate
4  Salameh a copy of the Administrative Detention Order on June 17, 1998, at the I
5  Housing Unit in SHU, after he signed the Order.  Bengford Decl., ¶ 7; Ex. 12
6  attached thereto.  When Officer Bengford handed Inmate Salameh the
7  Administrative Detention Order, Bengford recalled that Inmate Salameh did not
8  mention any staff assault or injuries to him.  Bengford Decl., ¶ 8.  Officer Bengford
9  did not see any injuries to Inmate Salameh's face or any part of his body.  Id.
10 Inmate Salameh did not ask Officer Bengford for medical assistance.  Id.

11     44.  Because of Bengford's work as an SIS Officer, he would have a higher
12 duty to observe and report any staff misconduct issues.  Bengford Decl., ¶ 8.
13 Officer Bengford would have contacted his supervisor immediately and prepared a
14 memorandum if Inmate Salameh had reported to him that he had been assaulted or
15 injured or if Officer Bengford had suspected that Inmate Salameh had been
16 assaulted or injured by any BOP staff on June 17, 1998.  Id.  Moreover, Officer
17 Bengford routinely made rounds in SHU at least twice a week and made rounds in
18 SHU while Inmate Salameh was in SHU.  Id.  If there was an incident in SHU,
19 Officer Bengford also responded and investigated with other SIS staff, which meant
20 he could be in SHU for a few hours at a time.  Bengford Decl., ¶ 8.  While Inmate
21 Salameh was in SHU from June 17, 1998 to June 30, 1998, he did not report to
22 Officer Bengford that he was assaulted by anyone while he was being escorted from
23 the M Unit to the I Unit of SHU.  Id.

24     45.  Lieutenant Garcia was assigned to work in SHU during the time that
25 Inmate Salameh was in the I Housing Unit of SHU.  Garcia Decl., ¶ 13.  On June
26 24, 1998, Lieutenant Garcia also conducted Inmate Salameh's 7-day special
27 housing review.  Id.; Ex. 23 attached thereto.  During the special housing review,
28 Lieutenant Garcia personally interviewed Inmate Salameh.  Garcia Decl., ¶ 13.

18

1 However, Inmate Salameh did not report any staff misconduct to him during the
2 interview or at any time during the period Lieutenant Garcia was assigned to work
3 in SHU while Inmate Salameh was also in SHU. Id. Lieutenant Garcia would be
4 required to inform his supervisors accordingly, if Inmate Salameh had reported any
5 staff misconduct and would have done so. Id.

6     46. Correctional Counselor Salvador Franco talked to and observed Inmate
7 Salameh on a daily basis at the M Housing Unit. Franco Decl., ¶ 3. He worked on
8 Inmate Salameh's programming needs and worked well with him. Id., ¶ 4. On his
9 weekly rounds in SHU, Counselor Franco would talk to or see Inmate Salameh. Id.,
10 ¶ 3. At any time, Inmate Salameh could ask for Counselor Franco to talk or see him
11 in the I Housing Unit. Id.

12     47. Counselor Franco recalled resolving many of Inmate Salameh's minor
13 grievances informally before he filed any administrative remedy. Franco Decl., ¶ 4.
14 Inmate Salameh was constantly complaining about various minor issues that were
15 not to his satisfaction. Id. However, Counselor Franco did not recall Inmate
16 Salameh ever reporting or complaining to him about the alleged mistreatment on
17 June 17, 1998 or any BOP staff assaulting or causing him injury at that time. Id. If
18 Inmate Salameh had reported an assault, even if the injuries were as minor as they
19 allegedly were in this incident, Counselor Franco would have reported it to his
20 supervisor and written a memorandum as required regarding any mistreatment of an
21 inmate. Franco Decl., ¶ 5. The incident and staff involved would have been
22 investigated accordingly. Id. However, Counselor Franco never reported any such
23 assault by BOP staff or wrote any memorandums about Inmate Salameh being
24 assaulted or abused because Inmate Salameh did not report or complain to
25 Counselor Franco that he was ever assaulted or abused by BOP staff.
26 Id.

27     48. Counselor Franco never observed any cuts or bruises on Inmate
28 Salameh's face or any part of his body. Franco Decl., ¶ 5.

1     49.   Lieutenant Manspeaker did not recall receiving any report from any
2  inmate or staff that Inmate Salameh was assaulted by staff while in the SHU on June
3  17, 1998. Manspeaker Decl., ¶ 6.  He would have heard or seen the incident if the
4  staff had to use force on Inmate Salameh or any other inmates on June 17, 1998. Id.
5  He would have remembered if Inmate Salameh was assaulted on that date. Id.

6     50.   At that time, Lieutenant Manspeaker made weekly SHU rounds, which
7  was in addition to going to SHU to talk to staff or inmates a few times during the
8  week. Manspeaker Decl., ¶ 7.  While he was in SHU, Inmate Salameh did not tell
9  Lieutenant Manspeaker or others that he was assaulted by the SORT members on
10  June 17, 1998. Id.  Lieutenant Manspeaker recalled having other discussions with
11  Inmate Salameh after his release from the SHU but Inmate Salameh did not discuss
12  the alleged June 17 incident with Lieutenant Manspeaker. Id.

13     51.   On June 29, 1998, Lieutenant Fitzmaurice interviewed the 19 inmates
14  who were placed in SHU on June 17, including Inmate Salameh. Fitzmaurice Decl.,
15  ¶ 11.  During the interview, Inmate Salameh did not mention any staff assault or
16  injuries. Id., ¶ 12.  Lieutenant Fitzmaurice did not see any injuries to Inmate
17  Salameh's face or any part of his body. Id.  No inmate witnessed the alleged assault
18  of Inmate Salameh, while he was being escorted through the H Unit to the I Unit.
19  Fitzmaurice Decl., ¶ 13.

20     52.   The evidence further showed that even when Inmate Salameh
21  complained of injuries later in the day on June 17, 1998, to Physician's Assistant
22  Pagaduan, he did not exhibit any injuries which appeared to result from excessive
23  force. See Decl. of Grethel Pagaduan ("Pagaduan Decl."), ¶¶ 3, 4 and 5; Ex. 4
24  attached thereto.   Inmate Salameh complained of soreness and numbness to the
25  wrists, a common occurrence after the utilization of secure handcuffs. Pagaduan
26  Decl., ¶ 3.   The handcuff marks on his wrists consisted of a little redness but no
27  indentation, grooves, or broken skin on the wrists. Id., ¶ 5.  She did not observe any
28  redness or swelling with respect to Inmate Salameh's eyes or eyelids. Id., ¶ 9.

1   Inmate Salameh never mentioned to the Physician's Assistant on June 17, 1998, that
2   he had any problems with his eyes. Id. Inmate Salameh had a small amount of
3   blood on one of his toenails that had originated from the small 0.5 cm cut on his
4   chin and had dripped down to his toenail. Pagaduan Decl., ¶¶ 4, 5. Inmate Salameh
5   did not have any other cuts or blood on him. Id., ¶ 10. His toes did not appear to
6   have been stomped on; they were not red, bruised, swollen, cut, or injured in any
7   way. Id.

8       53. The Physician's Assistant noted that Inmate Salameh only had a minor
9   scratch on the right side of his face. Pagaduan Decl., ¶ 4. The small cut and minor
10  scratch on Inmate Salameh's face were not consistent with being forcibly banged
11  into bars, gates or walls but could have been self-inflicted or caused by any number
12  of other minor accidents or conflicts. Id., ¶ 10. Even if the blood had come from
13  his toe, such minor bleeding on a toenail was more consistent with stubbing his toe
14  than with having his bare feet stomped on by booted guards during the transfer. Id.

15      54. A week later, on June 24, 1998, he was seen by Physician's Assistant
16  Mahesh Patel who testified that Inmate Salameh was complaining of "blue eye"
17  with respect to his right eye. Decl. of Mahesh Patel ("Patel Decl."), ¶ 5. However,
18  the Physician's Assistant testified that he observed no echymosis (no black eye) and
19  only a minor bruise to Inmate Salameh's right upper eyelid, which was not
20  indicative of any significant trauma. Id., ¶¶ 6-7.

21      55. Dr. Philip Ente, a neurologist, testified that as a BOP-contracting
22  physician he was consulted in April 2000, because Inmate Salameh was claiming
23  numbness in his left hand and he examined Inmate Salameh at that time. Decl. of
24  Dr. Philip Ente ("Ente Decl."), ¶¶ 2-8. Based on Dr. Ente's examination and testing,
25  he found that there was no damage to any of the nerves going through Inmate
26  Salameh's left wrist. Id., ¶ 8. Dr. Ente's diagnosis was that Inmate Salameh did not
27  have any injury to his hand due to handcuffs. Id., ¶ 9.

28      56. Officer Swanson is not liable to Inmate Salameh in this action.

1    57.   To the extent that these findings of fact may also contain conclusions of
2   law they should be deemed incorporated within the following Conclusions of Law.
3                              **CONCLUSIONS OF LAW**
4    1.   Inmate Salameh's claims are brought against Officer Swanson under
5   Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388
6   (1971).  In order to prevail in his Bivens claim against Officer Swanson, Inmate
7   Salameh must establish that Officer Swanson personally violated his Eighth
8   Amendment right.  See Chuman v. Wright, 76 F.3d 292, 294 (9th Cir. 1996); Jones
9   v. Williams, 297 F.3d 930, 934-35 (9th Cir. 2002).
10    2.   Specifically, in order to prevail in his Eighth Amendment claim, Inmate
11   Salameh must establish that Officer Swanson used malicious or sadistic force
12   against Inmate Salameh.  Jeffers v. Gomez, 267 F.3d 895, 910-11 (9th Cir. 2001).
13    3.   The conditions of a prisoner's incarceration are subject to analysis under
14   the Eighth Amendment.  Hutto v Finney, 437 U.S. 678, 685 (1978); Hoptowit v.
15   Spellman, 753 F.2d 779, 784 (9th Cir. 1985).  However, under the Eighth
16   Amendment doctrine, prison officials are afforded "wide-ranging deference in the
17   adoption and execution of policies and practices that in their judgment are needed to
18   preserve internal order and discipline and to maintain institutional security."  Bell v.
19   Wolfish, 441 U.S. 520, 547 (1979); Anderson v. County of Kern, 45 F.3d 1310,
20   1316 (9th Cir. 1995), *as amended* 75 F.3d 448 (1995), *cert. denied,* 516 U.S. 916
21   (1995).
22    4.   In particular, "[t]he unnecessary and wanton infliction of pain...constitutes
23   cruel and unusual punishment forbidden by the Eighth Amendment."  Hudson v.
24   McMillan, 503 U.S. 1, 5 (1992) *quoting* Whitley v. Albers, 475 U.S. 312, 319
25   (1986). What is necessary to establish unnecessary and wanton infliction of pain
26   varies according to the nature of the constitutional violation.  Whitley, 475 U.S. at
27   320. When prison officials are accused of using excessive physical force in violation
28   of the Eighth Amendment, the "core judicial

1  inquiry is...whether force was applied in a good-faith effort to maintain or restore
2  discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7-8,
3  *citing* Whitley v. Albers, 475 U.S. 312 (1986). Accordingly, the plaintiff must
4  establish that the defendant used malicious or sadistic force against him. Jeffers v.
5  Gomez, 267 F.3d 895, 910-11 (9th Cir. 2001).

6      5. However, the Eighth Amendment's prohibition on cruel and unusual
7  punishments "necessarily excludes from constitutional recognition de minimis uses
8  of physical force, provided that the use of force is not of a sort 'repugnant to the
9  conscience of mankind.'" Hudson v. McMillian, 503 U.S. 1 at 9-10, *citing* Whitley,
10 475 U.S. at 327. Thus, the Supreme Court has recognized that not every
11 "malevolent touch by a prison guard gives rise to a federal cause of action." *Id.*

12     6. In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court clarified the
13 test for qualified immunity and established a two-step analysis. *Id.*; Drummond ex
14 rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003). The first
15 step is to determine whether the alleged actions are unconstitutional as a matter of
16 law. Saucier, 533 U.S. at 201; *see also* Johnson v. County of Los Angeles, 340 F.3d
17 787, 791-792 (9th Cir. 2003). If not, the inquiry ends.

18     7. If so, the next step is to analyze whether the defendants are entitled to
19 qualified immunity because the rights asserted were not clearly established at the
20 time. *Id.* The "relevant, dispositive inquiry in determining whether a right is clearly
21 established is whether it would be clear to a reasonable officer that his conduct was
22 unlawful in the situation he confronted." Saucier, at 202. Although the precise act
23 need not have been declared unlawful, its unlawfulness must be apparent in the light
24 of pre-existing law. Hope v. Pelzer, 536 U.S. 730, 739 (2002); *see also* Estate of
25 Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002).

26     8. Accordingly, a defendant is entitled to qualified immunity if he makes a
27 reasonable mistake. Saucier, 533 U.S. at 205. "Qualified immunity "shields an
28 officer from suit when she makes a decision that, even if constitutionally deficient,

1  reasonably misapprehends the law governing the circumstances she confronted."
2  Brosseau v. Haugen, 125 S.Ct 596, 599 (2004).  In Brosseau, the Supreme Court
3  held that an officer was entitled to qualified immunity because her use of deadly
4  force "fell within the 'hazy border between excessive and acceptable force.'"  *Id.* at
5  600, *quoting* Saucier, 533 U.S. at 206.

6      9.  This standard "'gives ample room for mistaken judgment' by protecting
7  'all but the plainly incompetent or those who knowingly violate the law.'"  Hunter,
8  *supra, quoting* Malley v. Briggs, 475 U.S. 335, 343 (1986).  The "accommodation
9  for reasonable error exists because 'officials should not err always on the side of
10 caution' because they fear being sued."  Hunter, at 228-229, *quoting* Davis v.
11 Scherer, 468 U.S. 183, 196 (1984).

12     10.  This inquiry is distinct from the initial inquiry into the constitutional
13 violation.  Saucier, 533 U.S. at 205 (Qualified immunity inquiry "has a further
14 dimension"); Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002)
15 ("Saucier's key point is that the qualified immunity inquiry is separate from the
16 constitutional inquiry").

17     11.  The defendant's mental state, therefore, is only relevant to the qualified
18 immunity test to the extent that it is an element of the alleged constitutional
19 violation.  Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002); Jeffers v. Gomez,
20 267 F.3d 895, 911 (9th Cir. 2001); Crawford-El v. Britton, 523 U.S. 574, 587-589
21 (1998) ("Evidence concerning the defendant's subjective intent is simply irrelevant
22 to [qualified immunity]").

23     12.  Accordingly, a defendant may act "maliciously and sadistically to cause
24 harm," and may still act "reasonably" for the purposes of qualified immunity.
25 Marquez v. Gutierrez, 322 F.3d 689, 693 (9th Cir. 2003).  "Courts may not simply
26 stop with a determination that a triable issue of fact exists as to whether prison
27 officials [acted unconstitutionally]; instead, the qualified immunity inquiry is
28 separate from the constitutional inquiry."  *Id.*, *quoting* Estate of Ford v. Ramirez-

1  Palmer, 301 F.3d at 1053; *See also* Crawford-El v. Britton, 523 U.S. 574, 587-589
2  (1998) ("[A] defense of qualified immunity may not be rebutted by evidence that the
3  defendant's conduct was malicious or otherwise improperly motivated"); Hope v.
4  Pelzer, 536 U.S. 730, 739 (2002) (After finding prison officials violated Eighth
5  Amendment by showing "reckless indifference" to dangerous prison conditions,
6  Court held that "Despite their participation in ... constitutionally impermissible
7  conduct, respondents may nevertheless be shielded from liability for civil damages
8  if their actions did not violate clearly established statutory or constitutional rights of
9  which a reasonable person would have known.") (internal quotations and citations
10 omitted).

11      13.  In this case, the evidence showed that Officer Swanson is not personally
12 liable to Inmate Salameh under Bivens because Inmate Salameh cannot establish
13 that Officer Swanson violated Inmate Salameh's Eighth Amendment right by using
14 malicious or sadistic force against him.

15      14.  Furthermore, even if Inmate Salameh were to establish an Eighth
16 Amendment violation, he cannot establish that Officer Swanson engaged in any
17 clearly unlawful conduct.

18      15.  Officer Swanson and other BOP staff testified that Inmate Salameh was
19 indeed handcuffed in accordance with BOP policy on the precautionary use of
20 restraints.  Inmate Salameh was also held on his upper arm according to transfer
21 protocol pertaining to maximum security inmates such as Inmate Salameh.
22 However, the escort team members did not carry or lift Inmate Salameh up under his
23 arm during the transfer on June 17, 1998.

24      16.  BOP staff also testified that Officer Swanson did not bang Inmate
25 Salameh into bars, walls or gates, stomp on his toes, or otherwise use excessive
26 force against him during the transfer.  Throughout the transfer as well as
27 immediately afterwards, Inmate Salameh was observed by a number of BOP
28 members, none of whom observed any injuries on Inmate Salameh.  The evidence

1  further showed that even when Inmate Salameh complained of injuries later in the
2  day, he did not exhibit any injuries which appeared to result from excessive force.

3         17.   In sum, Inmate Salameh cannot establish that Officer Swanson used
4  sadistic or malicious force against him so as to subject him to cruel and unusual
5  punishment.  Thus, Inmate Salameh cannot prevail on his claim that Officer
6  Swanson violated his rights under the Eighth Amendment.

7         18.   Officer Swanson is not liable to plaintiff in this action.

8         19.   Officer Swanson is entitled to judgment in this action.

9         20.   Inmate Salameh has been fully heard on these issues.

10        21.   This Court enters judgment on the merits for Officer Swanson pursuant
11  to Fed.R.Civ.P. 58 on the ground that Inmate Salameh's Bivens claim cannot be
12  maintained under the controlling law.

13        22.   To the extent that these conclusions of law may also contain findings of
14  fact, they should be deemed incorporated within the foregoing Findings of Fact.

15        23.   Judgment shall be entered in favor of defendant, dismissing plaintiff's
16  action.

17  DATED: January 3, 2008.

18

19                                        _____
                                           UNITED STATES DISTRICT JUDGE
20

21  Presented by:

22  THOMAS P. O'BRIEN
    United States Attorney
23  LEON W. WEIDMAN
    Assistant United States Attorney
24  Chief, Civil Division

25
          /s/
26  KATHERINE M. HIKIDA
    Assistant United States Attorney
27
    Attorneys for Federal Defendant
28  JASON SWANSON

                              26